CHARLES PETZOLDT, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 34853-84, 34408-85.     Filed March 29, 1989.

*Jordan Green* and *David C. Alexander III,* for the petitioner.

*James J. Everett,* for the respondent.

HAMBLEN, *Judge:* Respondent determined deficiencies and additions to tax in petitioner's Federal income taxes as follows:

| | | Additions to tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1) [1] | Sec. 6653(b)(2) | Sec. 6654 |
| 1983 | $861,136 | $430,568 | * | $52,737 |
| 1984 | 963,717 | 481,859 | ** | 60,589 |

*50 percent of the interest due on $861,136.
**50 percent of the interest due on $963,717.

The issues for determination are:

1. Whether petitioner had unreported income for the years in issue in the amount determined by respondent.

2. Whether petitioner is liable for the addition to tax under section 6653(b) for fraud.

3. Whether petitioner is liable for the failure to pay addition to tax under section 6654(a) for failure to pay estimated income tax.

FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner resided in Chatsworth, California, when he filed his petition in this case.

*Background*

Petitioner met William Muniz (hereinafter referred to as Muniz) at the Flying Tigers Air Museum in Paris, Texas, sometime in March 1980. At that time, Muniz was repairing a DC-4 to prepare the airplane to fly to Colombia, South

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

America, to pick up a load of marijuana to bring back to this country.

Petitioner at that time was involved with the crew of a different DC-4 which also was being prepared to fly to Colombia, South America, for a load of marijuana to be brought back to the United States. The pilot of petitioner's airplane asked Muniz to teach petitioner the duties of a flight engineer so that he could go along on that mission.

Muniz and petitioner were together in Paris, Texas, in March and April 1980, off and on for a period of between 4 to 6 weeks. During this time, petitioner told Muniz that petitioner recently had returned from Colombia, South America, where he had gone on a "scouting mission" for the landing strip there and procedures and/or techniques in coming into Colombia and leaving with marijuana. Petitioner's passport reflects that he made a trip to Colombia, South America, in 1979.

During the time Muniz and petitioner were together in Paris, they exchanged stories on how each man previously had smuggled marijuana across the border from Mexico into the United States.

While in Paris, Texas, petitioner was called "Chuch," "Chuck," and a couple of other derivatives of "Chuch." Muniz heard petitioner's friends and certain unnamed Mexicans call petitioner a name which sounded something like "Chack."

After he left Paris, Texas, Muniz did not see petitioner again until August 1982.

At this meeting petitioner told Muniz that petitioner had just flown in a load of marijuana from Mexico to Colorado in an Aero Commander airplane recently purchased by petitioner. He also told Muniz that petitioner wanted to hire a new pilot to do the same thing. Petitioner wanted to replace the old pilot because petitioner was having trouble getting the money for the marijuana the pilot was given to sell.

Petitioner hired Muniz to pilot petitioner's airplane to smuggle marijuana into the United States from Mexico. Muniz was to be paid $50,000 for this purpose.

After this meeting, petitioner returned to California to collect additional money from the sale of the marijuana he

recently had smuggled into the country. One week later, Muniz flew to San Diego to begin the new drug smuggling venture with petitioner.

Petitioner was in charge of running the whole operation pertaining to the smuggling of marijuana from Mexico to Colorado in his Aero Commander. Other individuals were involved with petitioner in this endeavor,[2] including the "head man" who lived in the Laurel Canyon area of Los Angeles, California. In September 1982, petitioner located a "stash house"[3] to store the marijuana which Muniz was to fly in from Mexico for petitioner. Petitioner also made arrangements for the vehicles and ground crews needed for this operation.

In September 1982, Muniz flew petitioner's airplane to Guadalajara, Mexico, to bring back a 600- to 850-pound load of marijuana. The mission was aborted, however, when Muniz's guide was not able to locate the landing strip there. Muniz returned to the United States and landed in McAllen, Texas, where the plane was met by agents of the U.S. Customs Service, the Drug Enforcement Administration (hereinafter referred to as DEA), and others. Since there was no contraband on the plane, the Government agents let Muniz go on his way.

As soon as Muniz saw petitioner following the aborted mission, Muniz suggested that the operation be terminated. Petitioner, however, told Muniz that petitioner was under pressure and that he wanted to follow through with the operation. Petitioner offered Muniz $75,000 and some marijuana to sell as an inducement to continue the operation. Furthermore, at the suggestion of the "head man" in Los Angeles, petitioner gave Muniz the Aero Commander. The airplane at the time was worth between $30,000 and $40,000. Muniz and petitioner parted company sometime after this; Muniz never actually flew a load of marijuana with or for petitioner.

Muniz testified at the trial under a grant of immunity pursuant to an arrangement with the U.S. Attorney,

---

[2]The record does not establish the identity of these individuals.

[3]A "stash house" is a place where marijuana is taken from the airplane to be stored and distributed. A drug dealer usually gives a person with a "clean record" or who does not look suspicious, money or other incentives to rent the house. The individual or individuals who rent the house never live in it, however.

Tucson, Arizona. The terms of the grant of immunity are not in the record.

On March 23, 1984, officers of the Pima County, Arizona, sheriff's office (hereinafter referred to as the sheriff's office) responded to a burglary-in-progress call at a residence at 11481 East Speedway, Tucson, Arizona (hereinafter referred to as the Speedway residence). Upon entering the Speedway residence, the officers observed a large quantity of marijuana. The officers then arrested the persons found on the premises.

An officer with the sheriff's office contacted Roger Wallace, an agent with the DEA in Tucson, about the marijuana found at the Speedway residence. After the DEA agents arrived at the Speedway residence, the sheriff's office asked the DEA to assume jurisdiction over the case.

The DEA agents that day obtained warrants authorizing the search of the Speedway residence and a residence at 521 South Placita Quince, Tucson, Arizona (hereinafter referred to as the Placita Quince residence). Under these search warrants, the DEA agents seized approximately 30,000 pounds of marijuana, drug ledgers[4] and other papers, some weapons, and some drug paraphernalia at the Speedway residence and approximately 10,000 pounds of marijuana, drug ledgers and other papers, and drug paraphernalia at the Placita Quince residence.

Based on the information seized at the Speedway and Placita Quince residences, the DEA agents obtained search warrants on March 26, 1984, for a residence at 1000 North Camino Cordon, Tucson, Arizona (hereinafter referred to the Camino Cordon residence), and 3492 East Calle Chica, Tucson, Arizona (hereinafter referred to as the Calle Chica residence). The DEA agents seized additional drug ledgers at the Camino Cordon and Calle Chica residences.

Jean Sweetser (hereinafter referred to as Sweetser), and Lea M. Petersen (hereinafter referred to as Petersen), leased the Placita Quince residence pursuant to a lease agreement

---

[4]Petitioner has objected to these drug ledgers on hearsay grounds. Petitioner refers throughout his briefs to the stenographic notebooks and other papers without reservation or challenge as "drug ledgers." We take the use of this nomenclature as a concession that the books and papers are in fact drug ledgers. Irrespective of petitioner's designation, based on the testimony of the witnesses and the appearance and contents of the stenographic notebooks and other papers, we conclude that these documents are in fact drug ledgers.

which commenced April 24, 1983. An unidentified male, not petitioner, gave Sweetser money to pay the rental provided for under the lease and to make payments of $100 each to herself and to Petersen as compensation for entering into the lease. Although Sweetser and Petersen leased the residence and made the rental payments, neither one of them ever lived there during the time they leased the residence. Petersen began dating petitioner sometime before Christmas 1983, and married him sometime in 1984, but after March 1984.

Seven persons, including Guillermo Soto-Leal (hereinafter referred to a Soto-Leal), Ricardo Bustamante, Israel Valles-Valencia, Sweetser, and Petersen, but not petitioner, were indicted on Federal criminal charges based on information derived from the drug ledgers and other items seized by the DEA agents at the Speedway, Placita Quince, Camino Cordon, and Calle Chica residences (hereinafter referred to as the stash houses).[5] Soto-Leal, Bustamante, and Valles-Valencia subsequently were convicted and sentenced to prison terms.[6] During Soto-Leal's criminal trial, the drug ledgers, or portions thereof (hereinafter referred to as the drug ledgers), seized at the stash houses were admitted into evidence. At that trial, an examiner of questioned documents (i.e., a handwriting expert) testified that many of the writings contained in the drug ledgers were made by Soto-Leal.

Sweetser and Petersen were acquitted of the Federal criminal charges for which they were indicted upon motion for directed verdict at the conclusion of the Government's presentation.

At the time of her arrest in connection with the seizure of the 10,000 pounds of marijuana by the DEA at the Placita Quince residence, Petersen gave her resident address as 510 South Grinnell, Tucson, Arizona (hereinafter referred to as the Grinnell residence). At that time, petitioner held legal title to the Grinnell residence.

On May 10, 1984, petitioner was stopped for speeding and arrested by a Florida highway patrol officer in Madison

[5]See *United States v. Guillermo Soto-Leal,* et al., No. CR-84-090-TUC-RBM, U.S. District Court for the District of Arizona.

[6]Their convictions subsequently were affirmed on appeal. See *United States v. Valles-Valencia,* 811 F.2d 1232 (9th Cir. 1987), as amended by 823 F.2d 381 (9th Cir. 1987).

County, Florida. Petitioner was the only person in the automobile when he was arrested. At the time of his arrest, the automobile petitioner was driving contained $610,712.42 in U.S. currency, which petitioner acknowledged to be his property, 55.6 grams of marijuana, amounts of diazepam and flurazepam (two controlled substances), drug paraphernalia, and his passport.

On October 9, 1984, petitioner pled guilty to attempted possession of the controlled substances and possession of the drug paraphernalia, both of which are misdemeanor offenses under the laws of the State of Florida.

Pursuant to a forfeiture proceeding in the State of Florida, petitioner acknowledged that at least $105,000 of the $610,712.42 found in his possession when he was arrested was contraband. Consequently, pursuant to Florida law, petitioner forfeited the $105,000 to the State of Florida.

### The deficiency determination

On or about May 11, 1984, John Gay (hereinafter referred to as Gay) interviewed petitioner at the Madison County, Florida, jail (hereinafter referred to as the jail). At that time and beyond, Gay was an Internal Revenue agent, specifically a Special Enforcement Program agent, working out of the Jacksonville, Florida, District Office of the Internal Revenue Service. As a Special Enforcement Program agent, Gay examined mainly people allegedly involved in illegal activities, specifically smuggling in marijuana or cocaine. Gay advised petitioner that Gay was a revenue agent and was concerned with the civil matters of the case, that is, the taxation of the money found in petitioner's possession when he was arrested.

At the time Gay interviewed petitioner at the jail, Gay did not give petitioner any "*Miranda* warnings." Petitioner admitted to Gay that the cash was his. He also told Gay that he was in the gold and jewelry business and needed the cash to buy gold. Petitioner further told Gay that he had not filed a tax return in the last 2 years. During the course of Gay's interview of petitioner, on at least three occasions, petitioner declined to respond to Gay's questions, saying he wanted to talk to his lawyer first. Gay finally terminated

the interview when petitioner refused to answer any more questions.

Based on information Gay received from a special agent with the Criminal Investigation Division of the Internal Revenue Service, Tucson, Arizona, Gay concluded that petitioner was involved with the marijuana smuggling operation discovered at the stash houses in Tucson, Arizona. Portions of the drug ledgers allegedly pertaining to petitioner were sent to Gay by that special agent.

On or about May 17, 1984, Gay telephoned (602) 745-1028. A woman answered; Gay identified himself and asked to speak to petitioner. Petitioner came to the telephone and spoke to Gay. Gay identified petitioner as being the individual on the telephone from the sound of his voice which Gay recognized from their prior conversation and from the context of their conversation. The telephone number 745-1028 is contained within several of the drug ledgers seized at the stash houses in conjunction with the names "Chuck," "Chack," or "Cha." The word "Chuck" and/or "Chack" also was associated in several of the drug ledgers with a list of drug purchases made between June 24, 1983, and March 21, 1984, totaling $3,053,430.

This telephone number is an unlisted number at the Grinnell residence, assigned to petitioner's mother. Petitioner and a former spouse purchased the Grinnell residence in 1974. This former spouse executed a quit claim deed in 1975 conveying all of her right, title, and interest in the Grinnell residence to petitioner. Petitioner executed a deed of trust and assignment of rents as to the Grinnell residence on or about June 21, 1977, for which a deed of release and full reconveyance in petitioner's favor was executed on January 16, 1980. Petitioner executed a quit-claim deed on May 17, 1984, conveying to his mother his interest in the Grinnell residence. The record does not establish what, if any, consideration petitioner's mother gave him for this property interest or its fair market value at the time of the conveyance.

Using the cash-expenditures method of income determination and the drug ledgers found at the stash houses, Gay determined that petitioner had unreported income for 1983 and 1984 in the following amounts:

*1983*

Marijuana Purchases

| Date | Amount |
| --- | --- |
| June 24, 1983 | $18,000 |
| June 29, 1983 | 66,500 |
| July 5, 1983 | 18,000 |
| July 10, 1983 | 42,000 |
| July 11, 1983 | 11,000 |
| July 12, 1983 | 4,000 |
| July 12, 1983 | 19,000 |
| July 14, 1983 | 59,000 |
| July 16, 1983 | 58,700 |
| July 17, 1983 | 40,000 |
| July 27, 1983 | 44,200 |
| July 29, 1983 | 20,000 |
| July 30, 1983 | 50,000 |
| Aug. 15, 1983 | 209,750 |
| Aug. 24, 1983 | 140,000 |
| Aug. 29, 1983 | 75,000 |
| Aug. 29, 1983 | 47,000 |
| Sept. 2, 1983 | 17,000 |
| Sept. 7, 1983 | 30,000 |
| Sept. 8, 1983 | 75,500 |
| Sept. 15, 1983 | 20,000 |
| Oct. 21, 1983 | 75,000 |
| Dec. 6, 1983 | 140,000 |
| Dec. 9, 1983 | 19,000 |
| Dec. 18, 1983 | 439,000 |
| | 1,737,650 |

*1984*

Marijuana Purchases

| Date | Amount |
| --- | --- |
| Jan. 4, 1984 | $12,480 |
| Jan. 11, 1984 | 164,800 |
| Feb. 15, 1984 | 500,000 |
| Feb. 18, 1984 | 36,000 |
| Feb. 25, 1984 | 142,500 |
| Mar. 7, 1984 | 119,000 |
| Mar. 16, 1984 | 250,000 |
| Mar. 21, 1984 | 91,000 |
| Cash in possession of petitioner at time of arrest in Madison County, Florida, on May 10, 1984 | 610,712 |
| Estimated personal living expenses ($1,000 times 12) | 12,000 |
| | 1,938,492 |

Following his arrest in Madison County, Florida, on May 10, 1984, petitioner paid the following amounts to attorneys or hospitals:

| Payee | Amount paid | Date |
|---|---|---|
| Lewis & Roca | $50,000.00 | June 1984 |
| Lewis & Roca | 24,550.00 | Oct. 1984 |
| Martin S. Page | 16,000.00 | Aug. 1984 |
| Edwin B. Browning, Jr. | 15,000.00 | Aug. 1984 |
| Michael J. Brown | 53,500.00 | 1984 |
| Steven Bosse | 2,000.00 | 1984 |
| St. Luke's Hospital | 6,228.65 | 1984 |
| Total | [7]167,278.65 | |

Petitioner did not provide to respondent any books or records with which respondent could determine petitioner's net worth or net income for the years in issue.

As of the date of petitioner's arrest in Florida on May 10, 1984, petitioner had not filed a U.S. Federal Individual Income Tax Return since the return he filed for his taxable year 1981. Petitioner filed Federal individual income tax returns reflecting income tax liability for the following years:

| Year | Tax liability | Refund |
|---|---|---|
| 1969 | $76 | $140.00 |
| 1971 | - - - | 143.05 |
| 1972 | 173 | 324.94 |
| 1973 | - - - | 74.30 |
| 1974 | - - - | 1,187.40 |
| 1975 | 633 | 6.70 |
| 1978 | - - - | 230.00 |
| 1980 | - - - | 299.00 |
| 1981 | 350 | 624.00 |

Petitioner did not file Federal individual income tax returns for his 1970, 1976, 1977, 1979, 1982, 1983, or 1984 years. Petitioner's Federal individual income tax returns for the 1980 and 1981 years show his occupation as "truck driver" and wages of $3,156 and $6,312, respectively. Other than $80 in income from refunds of State and local income taxes, the returns for 1980 and 1981 show no income other than wages.

---

[7]The record further shows that petitioner's mother paid an additional $12,500 on his behalf to Edward C. Kitchen in May 1984. The record does not disclose whether this $12,500 came from petitioner's funds, from his mother's funds, or from another source.

On May 23, 1984, respondent issued a jeopardy assessment against petitioner pursuant to section 6861 based on the alleged drug purchases made in 1983. Respondent further terminated petitioner's 1984 tax year as of May 10, 1984, to collect the taxes then due, pursuant to section 6851. The amount assessed was based on the cash recovered in Florida and the alleged drug purchases made in 1984. Petitioner sought review of these jeopardy and termination assessments in the U.S. District Court, District of Arizona. The District Court entered judgment in favor of the United States, finding that the jeopardy and termination assessments were reasonable. See *Petzoldt v. United States,* an unreported case (D. Ariz. 1984, 54 AFTR 2d 84-6384, 84-2 USTC par. 9991).

Respondent issued a notice of deficiency on July 17, 1984, for the 1983 year, and on June 14, 1985, for the 1984 year, in the amounts set forth above. Petitioner timely petitioned this Court for a redetermination of respondent's deficiency determinations.

OPINION

A. PRELIMINARY MATTERS

At the trial, petitioner raised objections on various grounds to certain of respondent's documentary and testimonial evidence which we admitted subject to those objections and further arguments to be presented in the briefs. Since some of this evidence is critical to the outcome of this case, we will address first our determination as to its admissibility.

The rules of evidence applicable to Tax Court proceedings are the rules applicable in trials without jury in the U.S. District Court for the District of Columbia. These include the Federal Rules of Evidence (hereinafter referred to as FRE). See Rule 143(a), Tax Court Rules of Practice and Procedure; *Vallone v. Commissioner,* 88 T.C. 794, 796 n. 3 (1987).

1. *The drug ledgers*

At trial, respondent sought to introduce into evidence the drug ledgers which were found at the stash houses. Peti-

tioner objected, arguing that the drug ledgers are hearsay as to petitioner and, therefore, not admissible under FRE Rules 801 and 802.[8] Petitioner also objected to the authenticity of the drug ledgers.

The drug ledgers and an enormous quantity of marijuana were seized by the DEA pursuant to valid search warrants. According to Gay, based on his personal experience, in appearance the records are similar to records maintained by other individuals who deal in drugs. The contents of the drug ledgers themselves show that they are the records of individuals dealing in large quantities of drugs. Therefore, we find that respondent has established the authenticity of these drug ledgers. See FRE rule 901(b)(4).[9]

---

[8]FRE 801 reads as follows:

### RULE 801. Definitions

The following definitions apply under this article:

(a) Statement. A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

(b) Declarant. A "declarant" is a person who makes a statement.

(c) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

(d) Statements which are not hearsay.—A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving the person; or

(2) Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

FRE 802 reads as follows:

### RULE 802. Hearsay Rule

Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress.

[9]FRE 901 in pertinent part reads:

### RULE 901. Requirement of Authentication Or Identification

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

\*        \*        \*        \*        \*        \*        \*

(4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

FRE rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A statement falling within the definition of hearsay under FRE rule 801(c) is not admissible unless it comes within one of the exceptions to the hearsay rule set forth in FRE rules 803 and 804.

Unquestionably, the drug ledgers are hearsay as to petitioner. Respondent contends, however, that the drug ledgers satisfy one or more exceptions to the hearsay rule and, thus, are admissible. For this purpose, respondent relies on FRE rules 803(6), 803(8), and/or 803(24).[10] Petitioner disagrees. We conclude that the drug ledgers are not admissible under FRE rules 803(6) or 803(8), but we find them to be admissible under FRE rule 803(24).

---

[10]FRE 803 in pertinent part reads:

\* \* \* \* \* \* \*

RULE 803. Hearsay Exceptions; Availability of Declarant Immaterial

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \* \*

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

\* \* \* \* \* \* \*

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

\* \* \* \* \* \* \*

(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

To support his arguments that the drug ledgers are admissible under one of the cited hearsay exceptions, respondent asks this Court to take judicial notice of the Soto-Leal criminal proceeding. Under FRE rule 201,[11] this Court may take judicial notice of adjudicative facts not subject to reasonable dispute which are either generally known within the jurisdiction of the Court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

It has been said that as a general rule, a court will not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it. *M/V American Queen v. San Diego Marine Const.,* 708 F.2d 1483, 1491 (9th Cir. 1983). Nonetheless, records of a particular court in one proceeding commonly are the subject of judicial notice by the same and other courts in other proceedings. *Estate of Reis v. Commissioner,* 87 T.C. 1016, 1027 (1986); *St. Louis Baptist Temple, Inc. v. Federal Deposit Insurance Corp.,* 605 F.2d 1169, 1172 (10th Cir. 1979). "[T]he extent to which the doctrine will be applied depends to a large degree upon considerations of expediency and justice under the particular circumstances of a case, as well as upon what it is that a court is asked to notice." *Funk v. Commissioner,* 163 F.2d 796, 801 (3d Cir. 1947). Thus, courts have taken notice that a particular case was on file, its docket number, who the attorneys of record were, who the presiding judge was, who the clerk of the court was, that a decision or judgment was entered, that an opinion was filed, as well as the language of a particular

---

[11]FRE 201 in pertinent part reads:

RULE 201. Judicial Notice of Adjudicative Facts

(a) Scope of rule. This rule governs only judicial notice of adjudicative facts.

(b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) When discretionary. A court may take judicial notice, whether requested or not.

(d) When mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information.

(e) Opportunity to be heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) Time of taking notice. Judicial notice may be taken at any stage of the proceedings.

opinion. See *Estate of Reis v. Commissioner, supra,* and cases cited therein.[12]

In *Estate of Reis,* respondent asked us to take judicial notice of specific findings of fact of the New York State courts in lengthy litigation involving parties in privity with the taxpayer. There the Court took judicial notice of the existence of the New York State court opinions but we declined to take judicial notice of the specific findings of fact therein, explaining:

Such findings do not satisfy the two tests of rule 201(b). They are not generally known to the public, nor are they so indisputable that their accuracy cannot reasonably be questioned. The mere fact that a court in one opinion makes findings of fact is not a basis for the same or another court in another proceeding to take judicial notice of those findings and deem them to be indisputably established for purposes of the pending litigation. * * * [*Estate of Reis v. Commissioner,* 87 T.C. at 1028-1029.]

Cf. *United States v. Haldeman,* 559 F.2d 31, 107 (D.C. Cir. 1976), cert. denied sub nom. *Ehrlichman v. United States,* 431 U.S 933 (1977) (district judge could take judicial notice in a preliminary hearing on the admissibility of certain evidence that certain testimony was in fact presented in another hearing at which the judge presided), and *United States v. Dancy,* 510 F.2d 779, 787 n. 43 (D.C. Cir. 1975) (Court of Appeals took judicial notice of testimony in two other proceedings but cautioned: "Our reference here to the records in *Norcome* and *Tillman* is not meant to establish as factual the testimony presented therein. * * * Rather, it is for the purpose of noting that the testimony and judicial findings in those cases appear to be sufficiently relevant to the issues in the present case to warrant inquiry on the remand we already require"), with *United States v. Hernandez,* 780 F.2d 113, 121 (D.C. Cir. 1986) (Court of Appeals was "troubled by District Court's broad use of its power to take judicial notice of matters outside the record" wherein the trial judge took judicial notice as substantive evidence of testimony in separate criminal trial of different defendant), and *Melong v. Micronesian Claims Com'n,* 643 F.2d 10, 12 n. 5 (D.C. Cir. 1980) (Court of Appeals refused to take judicial notice as

---

[12]See also *Levy v. Commissioner,* T.C. Memo. 1987-609; *C. F. Malanka & Sons, Inc. v. Commissioner,* T.C. Memo. 1979-187.

substantive evidence of unauthenticated documentary material consisting primarily of minutes of meetings and correspondence).

Here, we are concerned with a preliminary determination regarding the admissibility of evidence, not with the taking of notice as substantive evidence. FRE rule 104 [13] pertains to rulings on preliminary matters. FRE rule 104(a) specifically provides that preliminary questions concerning the admissibility of evidence are determined by the Court without regard to the rules of evidence except those with respect to privilege. We believe that, in the interests of justice, for the limited purpose of determining the admissibility of the drug ledgers, it is proper for us to take judicial notice of the fact that in the Soto-Leal criminal proceeding the drug ledgers were admitted as evidence of Soto-Leal's dealing in marijuana and that a handwriting expert testified at that trial that many of the writings contained in the drug ledgers were made by Soto-Leal.

We next consider whether the drug ledgers are admissible against petitioner in this case. First, respondent contends that the drug ledgers are admissible under FRE rule 803(6), the business records exception to the hearsay rule.

For a memorandum or record to be admissible as a business record, it must be (1) made by a regularly conducted business activity; (2) kept in the regular course of that business; (3) the regular practice of that business to make that memorandum; and (4) made by a person with knowledge or from information transmitted by a person with knowledge. FRE rule 803(6); *Clark v. City of Los Angeles,* 650 F.2d 1033, 1036-1037 (9th Cir. 1981), cert. denied 456 U.S. 927 (1982). Moreover, to be admissible

---

[13]FRE 104 in pertinent part reads:

RULE 104. Preliminary Questions

(a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

(b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

    *       *       *       *       *       *       *

(e) Weight and credibility. This rule does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility.

under FRE rule 803(6), business records must be authenticated "by the testimony of the custodian or other qualified witness." *United States v. Houser*, 746 F.2d 55, 61 (D.C. Cir. 1984) (court found inadmissible Bureau of Alcohol, Tobacco and Firearms tracer form offered to show weapon's movement in connection with interstate commerce; unnamed Government clerk who completed form and manufacturer's employee supplying information did not testify).

It is not essential that the offering witness be the one who prepared the records. Any person in a position to attest to their authenticity is competent to lay the requisite foundation for admissibility. *Pacific Service Stations Co. v. Mobil Oil Corp.*, 689 F.2d 1055, 1062 (9th Cir. 1982). At least one court has suggested that "there is no reason why a proper foundation for application of [FRE] Rule 803(6) cannot be laid, in part or in whole, by the testimony of a Government agent or other person outside the organization whose records are sought to be admitted." *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986). However, the offering witness must at least be familiar with the business's recordkeeping system. *United States v. Hathaway, supra.* See *United States v. Mahar*, 801 F.2d 1477, 1493 (6th Cir. 1986); *Wallace Motor Sales v. American Motors Sales Corp.*, 780 F.2d 1049, 1061 (1st Cir. 1985); *United States v. Wables*, 731 F.2d 440, 449 (7th Cir. 1984), and cases cited therein; 4 J. Weinstein, Evidence, par. 803(6)[02], p.803-178 (1988 ed.). See also *Karme v. Commissioner*, 673 F.2d 1062 (9th Cir. 1982), affg. 73 T.C. 1163 (1980).

No witness at the instant trial testified as to Soto-Leal's record-keeping system. Furthermore, we agree with petitioner that judicial notice of the criminal proceeding would not support the admission of the drug ledgers under FRE rule 803(6). At the criminal proceeding a handwriting expert testified that the handwriting in the drug ledgers for the most part was that of Soto-Leal, one of the defendants in the criminal proceeding. The Government there offered the drug ledgers into evidence as an admission against interest for Soto-Leal. The Government also offered the drug ledgers as evidence against the other defendants as a statement made by a co-conspirator. See *United States v. Valles-*

*Valencia,* 811 F.2d 1232, 1237-1238 (9th Cir. 1987), as amended 823 F.2d 381 (9th Cir. 1987). Admissions against interest and statements by co-conspirators fall outside the scope of the hearsay rule. FRE rule 801(d)(2). Thus, in the Soto-Leal criminal proceeding, no foundation was laid as to Soto-Leal's record-keeping system sufficient to authenticate the drug records under FRE rule 803(6) nor has the requisite foundational testimony been supplied in the instant case. Consequently, respondent has not shown here that the drug ledgers are admissible under the business records exception to the hearsay rule.

Next, respondent contends that, as suggested by the Court at trial, once seized the drug ledgers became part of a Government report and, as such, are admissible under FRE rule 803(8). Petitioner argues that the drug ledgers are hearsay within hearsay and, pursuant to FRE rule 805,[14] are admissible only if they independently meet one of the hearsay exceptions. We agree with petitioner.

FRE rule 803(8) excepts from the hearsay rule, "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth * * * (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report * * * or (C) in civil actions and proceedings * * * , factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Thus, documents authored by individuals or entities not "a public office or agency" cannot qualify for admission under FRE rules 803(8)(B) or (C). See *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 272 (3d Cir. 1983), revd. on other grounds sub nom. *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986); *Fraley v. Rockwell Intern. Corp.,* 470 F. Supp. 1264, 1267 (S.D. Ohio 1979). Hence, respondent here cannot rely on FRE rule 803(8) alone as ground for the admission of the drug ledgers but must have some independent basis for their admission under the hearsay rule exceptions.

---

[14]FRE 805 reads as follows:

RULE 805. Hearsay Within Hearsay

Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.

Lastly, respondent contends that the drug ledgers are admissible under FRE rule 803(24), the so called "catch-all" or residual exception to the hearsay rule. We agree.

FRE rule 803(24) excepts from the hearsay rule a statement not specifically covered by any of the other exceptions contained in FRE 803 if the statement has "equivalent circumstantial guarantees of trustworthiness," is offered as evidence of a material fact, is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and its admissibility accords with the general purposes of the Federal Rules of Evidence and the interests of justice. Furthermore, the proponent must give notice of his intention to offer the statement "sufficiently in advance of the trial or hearing to provide * * * a fair opportunity to meet it * * * and the particulars * * * including the name and address of the declarant." 4 J. Weinstein, Evidence, par. 803(24)[01], pp. 803-373-380 (1988 ed.); *Fong v. American Airlines, Inc.,* 626 F.2d 759, 763 (9th Cir. 1980).

In applying FRE rule 803 we are faced with two seemingly opposing policies. First, "federal law favors the admission of probative evidence. In fact, '(t)he Federal Rules and practice favor admission of evidence rather than exclusion if the proffered evidence has any probative value at all.' * * * Doubts 'must be resolved in favor of admissibility.' " *United States v. Holladay,* 566 F.2d 1018, 1020 (5th Cir. 1978), cert. denied 439 U.S. 831 (1978), quoting *Sabatino v. Curtiss National Bank of Miami Springs,* 415 F.2d 632, 636 (5th Cir. 1969), cert. denied 396 U.S. 1057 (1970). On the other hand, the residual exception to the hearsay rule "is to be used very rarely and only in exceptional circumstances 'to ensure that this provision does not emasculate our well developed body of law and the notions underlying our evidentiary rules.' " *Goldsmith v. Commissioner,* 86 T.C. 1134, 1140 (1986), quoting *United States v. Mathis,* 559 F.2d 294, 299 (5th Cir. 1977). For the following reasons we believe that the overwhelming interests of justice require the admission of the drug ledgers under FRE 803(24).

The drug ledgers were identified in the Soto-Leal criminal proceeding as having been written for the most part by a

defendant in an enormous drug smuggling operation. The entries were self-incriminating, made with regularity, and relied upon by the writer. See *United States v. Wright*, 826 F.2d 938, 945-946 (10th Cir. 1987) (inculpatory portions of codefendant's diary admitted); *United States v. McPartlin*, 595 F.2d 1321, 1350 (7th Cir. 1979), cert. denied 444 U.S. 833 (1979) (desk diary admitted). The ledgers were seized by agents of the DEA after local police officers accidentally stumbled upon the drug smuggling operation in the course of a burglary-in-progress call. There is nothing to suggest that the drug ledgers do not accurately reflect the drug transactions depicted therein. These facts show sufficient circumstantial guarantees of trustworthiness to assure reliability. See *United States v. Foster*, 711 F.2d 871, 882-883 (9th Cir. 1983), cert. denied 465 U.S. 1103 (1984) (records of drug transactions); *Karme v. Commissioner*, 673 F.2d at 1064-1065 (records of foreign banks); *United States v. McGrath*, 613 F.2d 361, 367-368 (2d Cir. 1979), cert. denied sub nom. *Buckle v. United States*, 446 U.S. 967 (1980) (record of drug dealings); *United States v. Friedman*, 593 F.2d 109, 118-119 (9th Cir. 1979) (written summary of official Chilean records).

Several of the drug ledgers contained the words "Chuck," "Chack," and/or "Cha." These words were associated in the drug ledgers with an unlisted telephone number registered to petitioner's mother at the Grinnell address. Gay discovered in May 1984 that petitioner could be reached at this number. Therefore, the drug ledgers can be linked to petitioner which further supports their trustworthiness. See *United States v. Baxter*, 492 F.2d 150, 164-165 (9th Cir. 1973), cert. denied 416 U.S. 940 (1974).

The drug ledgers are being offered by respondent both to link petitioner to an illegal, income-producing activity and to support the respondent's determination of unreported income. Therefore; it is clear that the drug ledgers are material.

Petitioner, not surprisingly, refused to furnish respondent any information regarding petitioner's income for the years at suit and maintained no records of his own sufficient for respondent to reconstruct his income. In light of the status of the Soto-Leal criminal proceeding at the time of this

trial, [15] it is improbable that respondent could have secured the testimony of Soto-Leal or the other defendants in the criminal proceeding. Regardless, Soto-Leal's business records would be more probative evidence as to petitioner's income than Soto-Leal's testimony would have been. Therefore, it is clear that the drug ledgers are the most probative evidence on the relevant issues which respondent could secure through reasonable efforts, and that the interests of justice would best be served by their admission.

The portion of the drug ledgers upon which respondent relies were made available to petitioner at the commencement of the jeopardy and termination assessments hearing held in 1984 in the U.S. District Court, District of Arizona.[16] Petitioner was informed during the stipulation process for this case that the evidence used in that hearing would be used here. Therefore, petitioner received the requisite notice of respondent's intention to offer the drug ledgers.

Petitioner relies upon *United States v. Garcia-Duarte*, 718 F.2d 42 (2d Cir. 1983), in arguing that the drug ledgers are inadmissible hearsay. There, the court held that certain drug records were not admissible as business records or a co-conspirator's statement. No argument was made that the records could be admissible under FRE rule 803(24). We do not read the *Garcia-Duarte* case as holding that the drug records would not be admissible under any exception to the hearsay rule and find its holding inapposite here.

Respondent has satisfied all of the requirements for the admission of the drug ledgers under FRE rule 803(24). Consequently, we find that the drug ledgers are admissible under the residual exception to the hearsay rule.

## 2. *Petitioner's statements while in custody*

At trial, petitioner interposed an objection to Agent Gay's testimony relating to statements made by petitioner on May 11, 1984, while in jail in Florida. Petitioner argued that the statements, made while he was in custody, should

---

[15]We take notice of the fact that the criminal case was appealed to the Court of Appeals for the Ninth Circuit and an opinion was issued therein on Feb. 26, 1987. See *United States v. Valles-Valencia*, 811 F.2d 1232 (9th. Cir. 1987), as amended 823 F.2d 381 (9th Cir. 1987).

[16]See *Petzoldt v. United States*, an unreported case (D. Ariz. 1984, 54 AFTR 2d 84-6384, 84-2 USTC par. 9991).

be excluded because Gay did not give to petitioner the warnings mandated by *Miranda v. Arizona,* 384 U.S. 436 (1966). In *Miranda,* the Court examined in-custodial abuses which eroded the Fifth Amendment guarantee that "No person * * * shall be compelled in any criminal case to be a witness against himself * * * ."

It has been said that:

> At the heart of Miranda are the propositions that the Fifth Amendment privilege against being compelled to be a witness against one's self is fully applicable during a period of custodial interrogation, that compulsion is inherent in interrogation in custodial surroundings, and that the protections flowing from adequate warning and the rights of counsel are needed to make the privilege against self-incrimination meaningful in such a setting. * * * [C. Wright, Federal Practice and Procedure: Criminal 2d sec. 76, at 124 (1982 ed.); fn. refs. omitted.]

The *Miranda* warnings are required to be given "when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. at 477. Subsequent cases have made it clear that *Miranda* warning requirements are not limited to just police officers or to station house interrogations. In *Mathis v. United States,* 391 U.S. 1 (1968), the Court held that the *Miranda* warnings were required at the commencement of an interview conducted by an internal revenue agent in a State prison during a routine tax investigation.

There the Court noted, at 4, that:

> It is true that a "routine tax investigation" may be initiated for the purpose of a civil action rather than criminal prosecution. To this extent tax investigations differ from investigations of murder, robbery, and other crimes. But tax investigations frequently lead to criminal prosecutions, just as the one here did. In fact, the last visit of the revenue agent to the jail to question petitioner took place only 8 days before the full-fledged criminal investigation concededly began. And, as the investigating revenue agent was compelled to admit, there was always the possibility during his investigation that his work would end up in a criminal prosecution. We reject the contention that tax investigations are immune from the *Miranda* requirements for warnings to be given a person in custody.

In *Mathis,* the Court held that the lower courts were wrong at the taxpayer's *criminal* trial for filing false claims for tax refunds in permitting the introduction of self-

incriminating evidence the taxpayer gave to the internal revenue agent without the agent warning the taxpayer of his right to be silent and right to counsel. *Mathis v. United States,* 391 U.S. at 5. The applicability of *Miranda* to civil proceedings is not clear however. For example, the Courts of Appeals have held that in deportation cases the absence of *Miranda* warnings does not render inadmissible an otherwise voluntary statement. See *Navia-Duran v. INS,* 568 F.2d 803, 808 (1st Cir. 1977); *Avila-Gallegos v. INS,* 525 F.2d 666, 667 (2d Cir. 1975); *Chavez-Raya v. INS,* 519 F.2d 397, 399-401 (7th Cir. 1975).

At the trial, this Court advised the parties that we would take petitioner's *Miranda* objection under advisement, with the parties to argue the issue on brief. Neither party, however, addressed the *Miranda* objection on brief. Since petitioner failed to argue this point on brief, we treat this as, in effect, a concession by petitioner. See subparagraphs (4) and (5) of Rule 151(e); *Money v. Commissioner,* 89 T.C. 46, 48 (1987). Therefore, we conclude that the statements petitioner made to Gay while in the Florida jail are admissible in evidence.[17]

### 3. *Negative inference*

Respondent argues that the Court can and should apply a negative inference from petitioner's reliance on a blanket Fifth Amendment assertion as to any evidence regarding his income and its source for 1983 and 1984 and thereby find that petitioner received taxable income in those years from marijuana sales. In his brief petitioner did not challenge directly the Court's power to draw a negative inference from petitioner's assertion of his Fifth Amendment privilege. Rather, he parries with the argument that: "In *Dellacroce, supra* [*Dellacroce v. Commissioner,* 83 T.C. 269, 286 (1984)], this Court held that such negative inferences as it might be permitted to draw from assertion by

---

[17]We note moreover that petitioner's statements, as relayed by Gay at trial that the money found in the automobile petitioner was driving when he was stopped for speeding in Florida was his, and that he had not filed Federal income tax returns for the last two years is cumulative as petitioner stipulated to the fact that he acknowledged the $610,712.42 found in the automobile was his property and the certifications of lack of record introduced at trial establish that petitioner filed no U.S. Individual Income Tax Returns for the tax years ended Dec. 31, 1970, 1976, 1977, 1979, and 1982. This evidence, therefore, would be in the record even if we had suppressed petitioner's custodial statements.

petitioner of his Fifth Amendment privilege would be insufficient to supply the admissible, probative evidence specifically linking the petitioner to the tax-generating acts which respondent must introduce to support a presumption of correctness for its notices of deficiency."

It is well established that the Fifth Amendment may excuse a taxpayer from responding to discovery or from testifying in this Court. *Dellacroce v. Commissioner, supra.* The witness may invoke the privilege when he reasonably apprehends a risk of self-incrimination although no criminal charges are pending against him. *Marchetti v. United States,* 390 U.S. 39, 53 (1968); *Hoffman v. United States,* 341 U.S. 479, 486 (1951). The privilege not only extends to testimony which would support a conviction, but also to testimony which would furnish a link in the chain of evidence needed to prosecute. *Hoffman v. United States, supra.* If the testimony is incriminating, then the propriety of invoking the privilege depends on whether the risk of prosecution is real. *Zicarelli v. New Jersey State Commission of Investigation,* 406 U.S. 472, 478 (1972); *Marchetti v. United States, supra* at 53; *Stubbs v. Commissioner,* 797 F.2d 936, 938 n. 2 (11th Cir. 1986), affg. per curiam an unreported order and decision of this Court. It is further well established that the privilege does not protect against a fear of prosecution which is remote, speculative, or fanciful. *Zicarelli v. New Jersey State Commission of Investigation, supra; Marchetti v. United States, supra; Stubbs v. Commissioner, supra.* However, the privilege must be accorded liberal construction in favor of the right it was intended to secure. *Hoffman v. United States, supra.* [18]

A valid assertion of the privilege against self-incrimination, however, is not a "substitute for evidence that would assist in meeting a burden of production," for to adopt such a view "would convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his." *United States v. Rylander,* 460 U.S. 752, 758 (1983). See also *Steinbrecher v. Commissioner,* 712 F.2d 195, 198 (5th. Cir.

---

[18]See *Platshorn v. Commissioner,* T.C. Memo. 1988-361.

1983), affg. a Memorandum Opinion of this Court. Cf. *United States v. Green,* 757 F.2d 116, 123 (7th Cir. 1985). This is true with respect to a taxpayer's meeting his burden of proof with respect not only to respondent's determinations as to underlying deficiencies, *Steinbrecher v. Commissioner, supra,* but also to additions to tax under sections 6651(a)(1), 6653(a)(1), and 6653(a)(2). *Moore v. Commissioner,* 722 F.2d 193, 196 (5th Cir. 1984), affg. a Memorandum Opinion of this Court.[19]

In a civil proceeding we may draw a negative inference from a party's invocation of his Fifth Amendment right against self-incrimination provided that there is some independent evidence in addition to the mere invocation of the privilege upon which to base the negative inference. *Baxter v. Palmigiano,* 425 U.S. 308 (1976); *United States v. Local 560 of the International Brotherhood of Teamsters,* 780 F.2d 267, 292-293 n. 32 (3d Cir. 1985), cert. denied 476 U.S. 1140 (1986). The civil fraud addition in tax cases has been held not to be criminal or quasi-criminal in nature. *Helvering v. Mitchell,* 303 U.S. 391 (1938).

We are satisfied here that, although at the time this case was tried no criminal charges against petitioner were pending, a real possibility of future charges being brought did exist.[20] We believe that it would improperly impinge upon petitioner's right to claim the Fifth Amendment privilege against self-incrimination were we to draw indiscriminately a negative inference from his refusal to testify. Petitioner, however, did not testify to any matter at the trial nor did he call any witnesses to testify on his behalf. We cannot assume that the testimony of absent witnesses would have been favorable to petitioner. Indeed, the normal inference is that it would have been unfavorable. *Pollack v.*

---

[19]See *Diehl v. Commissioner,* T.C. Memo. 1987-152; *Christensen v. Commissioner,* T.C. Memo. 1987-96; *Burns v. Commissioner,* T.C. Memo. 1987-90; *Germain v. Commissioner,* T.C. Memo. 1983-220, affd. by an unpublished opinion 742 F.2d 1455 (6th Cir. 1984); *Douglas v. Commissioner,* T.C. Memo. 1980-66, affd. by an unpublished opinion 665 F.2d 1044 (6th Cir. 1981).

[20]At the time of the jeopardy and termination assessments hearing, it appears that the DEA investigation was continuing. At the trial in the instant case, Wallace stated that he knew of no pending DEA case on petitioner. Respondent, however, introduced no proof that a future case would or could not be instituted against petitioner. Respondent further introduced no proof that future criminal proceedings stemming from the marijuana smuggling investigation or petitioner's failure to file tax returns would not or could not be instituted. Absent this proof, we must assume that, at the time of the trial here, the Government had not abandoned any possible future criminal proceeding against petitioner.

*Commissioner,* 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968). See also *Tokarski v. Commissioner,* 87 T.C. 74, 77 (1986); *Bresler v. Commissioner,* 65 T.C. 182, 188 (1975); *Wichita Terminal Elevator Co. v. Commissioner,* 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Nor can we assume that all matter to which petitioner could have testified necessarily would have been protected by the Fifth Amendment. Although petitioner himself invoked the jurisdiction of this Court, he did not bother to appear at trial. In addition, petitioner maintained no records from which respondent could reconstruct his income for the years in issue. Thus, petitioner presented no evidence to rebut respondent's allegations of unreported income. Based on these circumstances, to draw no negative inferences from petitioner's failure to testify would permit petitioner to use the Fifth Amendment privilege as a sword rather than the intended shield.

In the instant case respondent has presented sufficient other, admissible evidence against petitioner linking him to the illegal sale of marijuana. Thus, we do not need to, nor do we, draw any negative inference from petitioner's assertion of his Fifth Amendment privilege to supply the admissible, probative evidence specifically linking petitioner to the tax-generating acts which respondent must introduce to support a presumption of correctness for the notices of deficiency.

We believe that, based on this record and the circumstances present here, it is proper for us to draw from petitioner's failure to testify or present other evidence relating thereto the inferences that he did not receive any gifts, legacies, inheritances, or devises in 1983 or 1984 or have any other, nontaxable source of funds for these years; and that he did not have any cash hoard as of January 1, 1983. We will draw no other inferences from petitioner's exercise of his Fifth Amendment privilege not to testify.

B. THE SUBSTANTIVE ISSUES

1. *The deficiency determination*

Section 6001 requires all taxpayers to maintain sufficient records to determine their correct tax liabilities. Where a taxpayer fails to keep the required books and records, or if

the records he or she maintains do not clearly reflect income, then respondent is authorized by section 446 to reconstruct income in accordance with a method which clearly reflects the full amount of income received. *Meneguzzo v. Commissioner,* 43 T.C. 824, 831 (1965). See also *Miller v. Commissioner,* 237 F.2d 830, 838 (5th Cir. 1956), affg. in part (on this issue) and revg. in part a Memorandum Opinion of this Court. The reconstruction need only be reasonable in light of all surrounding facts and circumstances. *Giddio v. Commissioner,* 54 T.C. 1530, 1533 (1970); *Schroeder v. Commissioner,* 40 T.C. 30, 33 (1963).

In the instant case, petitioner filed no Federal income tax returns for the years in suit. Respondent, however, determined that petitioner had taxable income for these years in the amounts set forth above. Petitioner maintained no books and records for 1983 or 1984 sufficient for respondent to determine his income for those years;[21] consequently, respondent determined petitioner's taxable income for these years using the cash- expenditures method of reconstructing income.

Petitioner contends that the notices of deficiency are not entitled to a presumption of correctness. Petitioner also argues that the method used by respondent to determine petitioner's tax liability for the years at suit is arbitrary and erroneous. On the basis of the record here, we find that respondent's determination is not arbitrary or erroneous and sustain his determination of petitioner's unreported income as set forth in the notices of deficiency.

The general rule is that the taxpayer has the burden of proving the Commissioner's determination of a deficiency to be wrong. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a). In the ordinary case, the courts impose this burden of proof on the taxpayer without looking behind the notice of deficiency to examine the evidence used by the Commissioner or the propriety of his motives or administrative policies or procedures in making the determinations re-

---

[21]We have made our determination based on the record before us. The record does not establish what, if any, records petitioner maintained for these years. Nor does the record reveal what steps respondent took in his investigation of petitioner to determine whether petitioner had any available books and records. This information would have been most beneficial to us in our determination. However, since the information was not available, the party bearing the burden of proof must suffer the consequences of an inadequate record. *Samis v. Commissioner,* 76 T.C. 609, 617 (1981).

flected in the notice. *Crowther v. Commissioner,* 269 F.2d 292, 293 (9th Cir. 1959), affg. on this issue 28 T.C. 1293, 1301 (1957); *Greenberg's Express, Inc. v. Commissioner,* 62 T.C. 324, 327-329 (1974); *Human Engineering Institute v. Commissioner,* 61 T.C. 61, 66 (1973).

Courts have recognized a limited exception to this general rule where respondent alleges that the taxpayer has unreported illegal income. See *Weimerskirch v. Commissioner,* 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977); *Llorente v. Commissioner,* 649 F.2d 152 (2d Cir. 1981), revg. in part and affg. in part 74 T.C. 260 (1980); *Dellacroce v. Commissioner,* 83 T.C. 269 (1984); *Jackson v. Commissioner,* 73 T.C. 394 (1979). Since an appeal in this case lies in the Ninth Circuit, which we are bound to follow, see *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we look to the cases decided therein for guidance here.

In *Weimerskirch v. Commissioner, supra,* the Commissioner determined that the taxpayer had a deficiency in his income tax based on a revenue agent's finding that the taxpayer omitted income derived from heroin sales. The only evidence supporting this determination was statements made to the agent by two confidential informants and certain information obtained by him from law enforcement officials. No admissible evidence was introduced at the trial to substantiate those statements or information or otherwise link the taxpayer to drug dealing. The court of appeals refused to sustain the Commissioner's determination, relying heavily on the Supreme Court's discussion in *United States v. Janis,* 428 U.S. 433 (1976), of the scope of the exclusionary rule in civil tax cases. The Supreme Court stated there that without the illegally seized evidence in issue, the Commissioner's determination would be "a 'naked' assessment without *any* foundation whatsoever" (emphasis in original), and that "an assessment * * * utterly without foundation * * * is arbitrary and erroneous." *United States v. Janis,* 428 U.S. at 441-442. The Ninth Circuit concluded that, "there must be some evidentiary foundation linking the taxpayer to the alleged income producing activity * * * where * * * the government asserts that the taxpayer was engaged in an activity which is

otherwise illegal." *Weimerskirch v. Commissioner,* 596 F.2d at 362.

The Ninth Circuit stated further that a "deficiency determination which is not supported by the proper foundation of substantive evidence is clearly arbitrary and erroneous." *Weimerskirch v. Commissioner, supra.* Further, the Ninth Circuit stated that respondent cannot rely on the presumption of correctness of a deficiency notice in such a case "in the absence of a minimal evidentiary foundation" by respondent showing that the taxpayer received unreported income from a charged activity. This is true even where the taxpayer has not made a showing that the notice was arbitrary. *Weimerskirch v. Commissioner,* 596 F.2d at 361. See also *Bradford v. Commissioner,* 796 F.2d 303, 305 (9th Cir. 1986); *Delaney v. Commissioner,* 743 F.2d 670, 671 (9th Cir. 1984); *United States v. Zolla,* 724 F.2d 808 (9th Cir. 1984), cert. denied 469 U.S. 830 (1984).

Thus, the Ninth Circuit requires that respondent come forward with substantive evidence establishing a "minimal evidentiary foundation" in all cases involving the receipt of unreported income to preserve the statutory notice's presumption of correctness. *Weimerskirch v. Commissioner,* 596 F.2d at 362. In *Rapp v. Commissioner,* 774 F.2d 932, 935 (9th Cir. 1985), and *Edwards v. Commissioner,* 680 F.2d 1268, 1270 (9th Cir. 1982), the court also explicitly held that the Commissioner's determinations must be supported by "some substantive evidence" demonstrating that "the taxpayer received unreported income." *Rapp v. Commissioner,* 774 F.2d at 935; *Edwards v. Commissioner,* 680 F.2d at 1270, citing *Weimerskirch v. Commissioner,* 596 F.2d at 360. See also *Tokarski v. Commissioner,* 87 T.C. at 76.

The Ninth Circuit has made it clear, however, that once the Government has carried its initial burden of introducing some substantive evidence linking the taxpayer with income-producing activity, the taxpayer has the burden to rebut the presumption of correctness of respondent's deficiency determination by establishing by a preponderance of the evidence that the deficiency determination is arbitrary or erroneous. See *Rapp v. Commissioner, supra; Adamson v. Commissioner,* 745 F.2d 541 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; *Delaney v. Commissioner,*

*supra; United States v. Stonehill,* 702 F.2d 1288 (9th Cir. 1983), cert. denied 465 U.S. 1079 (1984). The taxpayer's characterization of the assessment as arbitrary is not sufficient to overcome the presumption of correctness. *Rapp v. Commissioner, supra,* citing *Parkinson v. Commissioner,* 647 F.2d 875, 876 (9th Cir. 1981).

Respondent here has introduced admissible, substantive evidence clearly linking petitioner to the sale of marijuana and the receipt of unreported income. Muniz's uncontroverted testimony placed petitioner, at a minimum, in the business of importing marijuana as early as 1980, and further linked petitioner to the business of importing and selling marijuana at least through September 1982.

Petitioner challenges Muniz's credibility. However, his challenge rests solely on the basis that Muniz was testifying under a grant of immunity. We do not find this a sufficient basis in itself to disregard Muniz's testimony. We observed Muniz's demeanor on the stand and found his testimony to be direct, clear, consistent, and believable. We find him to be a credible witness.

The drug ledgers specifically link petitioner to the sale of marijuana in 1983 and 1984. We find it significant that Muniz placed petitioner in the business of smuggling and selling marijuana less than one year prior to the first entry in the drug ledgers which identifies purchases by "Chuck" or "Chack" in June 1983. See *United States v. Heyward,* 729 F.2d 297, 301 (4th Cir. 1984), cert. denied 469 U.S. 1105 (1985) (evidence that defendant's plane was found in 1980 loaded with marijuana was admissible to substantiate the Government's net worth claims for 1978 and 1979). Muniz's testimony connects petitioner to the nicknames "Chuck" and "Chack."

Moreover, in the *Weimerskirch* line of cases, the taxpayers were not shown by admissible evidence to have actually possessed any of the funds that respondent determined to be taxable income. *Schad v. Commissioner,* 87 T.C. 609, 618-620 (1986). Petitioner's possession on May 10, 1984, of $610,712.42 in U.S. currency, to which he claimed ownership, along with his passport, marijuana, and other controlled substances and drug paraphernalia, when he was

stopped by the Florida Highway Patrol further links petitioner to the sale of marijuana for the years in suit.

We did not agree with petitioner, citing *Dellacroce v. Commissioner, supra,* that respondent's evidence, at most, places petitioner only on the fringes of an illegal activity. Muniz's testimony clearly shows that petitioner had a leading role in importing and selling marijuana. Although Muniz's "business dealings" with petitioner ceased in September or October 1982, the drug ledgers and other evidence in the record confirm that petitioner continued in his illegal endeavors well into 1984. See *United States v. Heyward, supra.* The large amount of marijuana petitioner purchased, as shown by the drug ledgers, shows that he was much more than just a fringe actor in the drug dealing operation. Thus, there is sufficient evidence in the record linking petitioner to tax-generating acts in both 1983 and 1984.

We find that respondent has met his burden of introducing evidence linking petitioner to the illegal activity upon which the deficiency determination is based. The "naked assessment" cases cited by petitioner are inapplicable in this case because respondent has produced substantive evidence of petitioner's extensive activities in illegally selling marijuana. Petitioner therefore has the burden of proving that respondent's determination is arbitrary or erroneous. Petitioner has failed to carry this burden.

Petitioner offered no proof that he was not involved in drug trafficking in 1983 or 1984. He failed to present any witnesses, such as family members or friends, to rebut respondent's evidence regarding the illegal source of income. The failure of a party to call such available witnesses that purportedly have knowledge about relevant facts provides sufficient basis to infer that the testimony of such witnesses would not have been favorable to the party. *Pollack v. Commissioner,* 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968). Petitioner suggests that the testimony of respondent's witnesses Sweetser and Lori Petersen (sister of petitioner's wife) that they never saw petitioner purchase, sell, or use drugs rebuts respondent's allegations that petitioner was a drug trafficker in 1983 and 1984. Their testimony is insufficient for that purpose, however, since

the record fails to show that either woman had sufficient contact with petitioner to know whether he used or sold drugs.

The record establishes that petitioner was involved in selling drugs during the years in issue. Muniz's testimony places petitioner in the drug trafficking business. Muniz further links petitioner to the nicknames "Chuck" and "Chack." The drug ledgers connect the nicknames "Chuck" and/or "Chack" to an unlisted telephone number at the Grinnell residence. Gay's testimony further connects petitioner to that unlisted telephone number. The nicknames "Chuck" and/or "Chack" are associated in the drug ledgers with a list of drug purchases made between June 24, 1983, through March 21, 1984. From the totality of the record here, we conclude that references to "Chuck" and "Chack" in the drug ledgers are references to petitioner.

Moreover, when apprehended on May 10, 1984, police officers found $610,712.42, some marijuana, two other controlled substances, and drug paraphernalia in the car driven by petitioner. At that time, petitioner claimed ownership of the money. Subsequently, in a Florida forfeiture proceeding, petitioner admitted that $105,000 of the $610,712 was contraband.

The evidence of petitioner's minimal reported taxable wages for the years prior to 1983 makes it difficult to believe that petitioner could have accumulated a substantial cash hoard from wages. Nor does the record establish any other legal source for the $610,712.42 found in his possession when he was arrested, or for the $167,278.65 paid out following his arrest on May 10, 1984, to his attorneys and St. Luke's Hospital. On this record, we find that respondent properly included the cost of the purchases of marijuana and the $610,712 in petitioner's income for 1983 and 1984.

Respondent also included $12,000 as income in 1984 as petitioner's personal living expenses. Petitioner presented no evidence to rebut this estimate, and we find the amount reasonable. Therefore, we find that respondent also properly included this amount in petitioner's income for 1984.

Petitioner presented no evidence in this case to counter the evidence presented by respondent. Rather, on brief, petitioner argues that respondent has failed to satisfy the

essential conditions precedent to the use of the "cash expenditures" method in reconstructing petitioner's income by not giving petitioner credit for the cost of the marijuana allegedly purchased; not making a reasonable attempt to establish petitioner's beginning net worth with respect to 1983 and 1984; and not negating nontaxable sources for the cash-expenditures. We disagree with petitioner's arguments for the following reasons.

Section 446 confers broad powers on the "Secretary or his delegate," the Internal Revenue Service, to compute the taxable income of a taxpayer. As a general rule, the computation is made under the method of accounting regularly employed by the taxpayer. If no method of accounting has been used by the taxpayer, however, "the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income." Although the absence of adequate tax records does not give respondent carte blanche for imposing Draconian absolutes, such absence does weaken any critique of respondent's methodology. *Webb v. Commissioner*, 394 F.2d 366, 373 (5th Cir. 1968).

Consistent with the broad power to compute taxable income, section 6212(a) provides for the issuance of a notice of deficiency where the Secretary or his delegate "determines that there is a deficiency" in respect of certain taxes. Nowhere in the Code is there a provision which specifies the nature and quality of the evidence which the tax administrator must gather to support the determination, or the form and contents of the notice. *Mayerson v. Commissioner*, 47 T.C. 340, 348 (1966).

The absence of statutory guidelines suggests that Congress intended that respondent should have great latitude in making determinations of liability, particularly where the taxpayer files no returns and refuses to cooperate in the ascertainment of his income. Thus, respondent is entitled to use any reasonable means of reconstructing income. Further, he is given greater latitude in determining which method of reconstruction to apply where the case involves an illegal enterprise in which the taxpayer has failed to file a return and has kept no records. Nor is mathematical exactitude required of respondent, for if it were, it "would

be tantamount to holding that skillful concealment is an invincible barrier to proof." *Llorente v. Commissioner,* 74 T.C. at 266, quoting *United States v. Johnson,* 319 U.S. 503, 517-518 (1943).

Respondent determined the deficiencies against petitioner using the cash-expenditures method. The "cash-expenditures" method is a variant of the net-worth method of establishing unreported taxable income. The net-worth method involves the ascertaining of a taxpayer's net worth at the beginning and end of a tax period, and deriving that part of any increase not attributable to reported income. This method, while effective against taxpayers who channel their income into investment or durable property, is unavailing "against the taxpayer who consumes his self-determined tax free dollars during the year and winds up no wealthier than before." *Taglianetti v. United States,* 398 F.2d 558, 562 (1st Cir. 1968), affd. 394 U.S. 316 (1969). The cash-expenditures method is based on the assumption that the amount by which a taxpayer's expenditures during a taxable year exceed his reported income has taxable origins absent some explanation by the taxpayer. *Burgo v. Commissioner,* 69 T.C. 729, 742 (1978).

We agree with petitioner that the requirements set forth in *Holland v. United States,* 348 U.S. 121 (1954), are applicable to cases involving the cash-expenditures method of income reconstruction.[22] In *Holland,* the Court stated at page 132:

an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset. * * *

We do not agree, however, that respondent's failure here to determine petitioner's beginning and closing net worth for each of the years in suit is necessarily fatal to his case. In a typical net worth case, precise figures are needed for opening and closing net worth for all of the years involved to determine any relevant increase in net worth for these years. However, in the cash-expenditures method, reason-

---

[22]See *Estate of Gray v. Commissioner,* T.C. Memo. 1976-189.

able certainty may be established without a determination of the precise net worth figures, "as long as the proof * * * makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures." *Taglianetti v. United States*, 398 F.2d at 565. The First Circuit stated further that:

In a typical net worth case, as *Holland*, precise figures would have to be attached to opening and closing net worth positions for each of the taxable years to provide a basis for the critical subtraction. In a cash expenditures case reasonable certainty may be established without such a presentation, as long as the proof—as in this case—makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures. We recognize that courts occasionally blur the distinction between the two approaches and use language implying that they are subject not only to the same principle of excluding the availability of nontaxable resources but also to the same method of implementing that principle, i.e., establishing net worth figures. Appellant has cited several cash expenditure cases for the latter proposition. A careful review of the language used and the problems addressed in these opinions indicates that they cannot be fairly read as embracing such an inflexible formal requirement. [*Taglianetti v. United States, supra;* fn. ref. omitted.]

Formal net worth statements are not required as long as sources of available funds are identified and quantified. *Taglianetti v. United States, supra* at 565 n. 7. The relevant issue in a cash expenditures case is whether any expenditures in excess of reported income can be attributed to assets available at the beginning of the relevant period or to nontaxable receipts, such as loans, gifts, or inheritances. *Taglianetti v. United States, supra* at 566, citing *United States v. Johnson, supra.*

Where the taxpayer has refused to produce books and records requested by respondent's agents, the taxpayer, not respondent, will be held accountable for any procedural or evidentiary consequences flowing from the declination. *Durovic v. Commissioner*, 54 T.C. 1364, 1390 (1970), affd. in part, revd. in part, and remanded in part 487 F.2d 36 (7th Cir. 1973), cert. denied 417 U.S. 919 (1974). Furthermore, where no relevant leads are forthcoming, respondent is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the

taxpayer. *Holland v. United States,* 348 U.S. at 138. Moreover, respondent does not have to negate every possible source of nontaxable income if he proves a likely source of income. One or the other will do. *United States v. Chu,* 779 F.2d 356, 366 (7th Cir. 1985); *United States v. Mastropieri,* 685 F.2d 776, 784-785 (2d Cir. 1982), cert. denied sub nom. *Pate v. United States,* 459 U.S. 945 (1982).

Petitioner complains about the sufficiency of respondent's investigation; however, he offered respondent no leads whatsoever as to any possible sources of nontaxable receipts for the years in suit. Respondent introduced evidence showing that petitioner filed no Federal individual income tax returns for 1970, 1976, 1977, 1979, and 1982. Respondent introduced further evidence showing that the tax returns petitioner filed for 1969, 1971 through 1975, and 1978 reflected no or only a nominal tax liability and minimal taxes withheld from which we infer that petitioner reported only a marginal amount of taxable income for those years. The tax returns petitioner filed for 1980 and 1981 report taxable wages of only $3,156 and $6,312, respectively, for those years, and report no interest or dividend income. We infer from this evidence that, for the years prior the years in issue, petitioner could not have accumulated from wages the assets or cash hoard he would have needed to be available at the beginning of the years in issue in order to attribute from those sources the cash expenditures determined here by respondent. The record discloses no other legal source for those expenditures. Nor is there any evidence that petitioner sold any assets before the time he was arrested in Florida.

The record contains no evidence that petitioner had any cash hoard at the beginning of the relevant period or received any nontaxable receipts during the years involved in this case. Gay's testimony connects petitioner to the drug ledgers. Muniz's testimony and the drug ledgers link petitioner to the receipt of taxable income from the sale of marijuana as determined by respondent. We believe that, in light of the circumstances present here where petitioner has the burden of proof, has maintained no records, and has refused to cooperate with respondent, and where respondent has connected petitioner through substantive evidence to a

likely source for the expenditures and has shown petitioner had no likely source for a decrease in net worth, at a minimum, petitioner has the burden of introducing some substantive evidence showing that at least some of the cash expenditures can be explained by a diminution of his net worth and/or from other nontaxable sources. Cf. *United States v. Bianco,* 534 F.2d 501, 506 (2d Cir. 1976), cert. denied 429 U.S. 822 (1976) ("once the government has introduced sufficient evidence from which the jury could conclude with reasonable certainty that no [nontaxable] assets existed, the defendant remains silent at his own peril.")

Petitioner has the burden of proving error as to respondent's deficiency determination. Petitioner elected to present no evidence on this issue; the failure to do so must fall on his shoulders, not on respondent's. See *United States v. Mackey,* 345 F.2d 499 (7th Cir. 1965), cert. denied 382 U.S. 824 (1965); *Samis v. Commissioner,* 76 T.C. 609, 617 (1981).

Petitioner suggests further that the marijuana advanced to him is a nontaxable source for the marijuana purchases. This argument, however, does not survive scrutiny. Petitioner's contention that the "fronting" of the marijuana supplies a nontaxable source for the marijuana purchases of more than twice the amount of taxable income reflected in the notices of deficiency can only be premised on an assumption that petitioner would have sold the marijuana for its cost to him. There is nothing in the record which would indicate that petitioner sold marijuana for philanthropic reasons, expecting no profit for his efforts. Common sense would dictate the conclusion that anyone who is in an illegal and dangerous business such as the dealing of drugs would demand a very large profit for his enormous risks. A 100-percent or better profit ratio does not seem unreasonable considering the nature of the illegal activity involved here. Petitioner presented no evidence establishing a lesser margin-of-profit.

Petitioner has the burden of proof. He presented no substantive evidence on which we could base a lesser calculation of unreported income (for example, testimony as to the street value of the marijuana which the drug ledgers

indicate petitioner purchased). The drug ledgers substantiate the amount of the drug purchases. Absent substantive evidence from petitioner showing respondent's determination erroneous, under the facts present here, we uphold respondent's determination.

Petitioner's alternative argument that respondent failed to give petitioner credit for his costs of goods also must fail. Respondent reconstructed petitioner's income for 1983 and 1984 primarily on the basis of the amount of money he paid for the marijuana he purchased in those years. Petitioner did not provide any records from which respondent could determine either net sales or inventory. Therefore, respondent did not have sufficient information for 1983 and 1984 to determine petitioner's cost of goods sold or net profit. Nor does the record here contain this information. We would distort income if, on this record, we allowed petitioner an expense for cost of goods sold in the manner suggested by petitioner. Based on the record here, we find respondent's method to be reasonable and hold for him on this issue.

## 2. *Self-employment tax*

Petitioner presented no evidence contesting respondent's determination that he is subject to self-employment tax under section 1401. Respondent found that petitioner earned income in the amount of $1,737,650 for 1983 and $1,938,492 for 1984. We find petitioner subject to self-employment tax on this amount.

## 3. *Fraud*

Respondent determined that petitioner is liable for additions to tax under section 6653(b)(1) and (2) for fraudulently understating his income in 1983 and 1984. Section 6653(b)(1) provides that if any part of the underpayment is due to fraud, there will be an addition to tax equal to 50 percent of the entire underpayment. The addition imposed by section 6653(b)(2), however, applies only to the portion of the underpayment that is attributable to fraud. Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. *Powell v. Granquist,* 252 F.2d 56 (9th Cir. 1958); *Mitchell v. Commissioner,* 118 F.2d 308 (5th Cir.

1941); *Estate of Pittard v. Commissioner,* 69 T.C. 391 (1977).

Respondent has the burden of proving by clear and convincing evidence that an underpayment exists for the years in issue and that some portion of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. *Stoltzfus v. United States,* 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); *Webb v. Commissioner,* 394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; *Rowlee v. Commissioner,* 80 T.C. 1111, 1123 (1983). Respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment of tax for each year in issue is attributable to fraud. *Lee v. United States,* 466 F.2d 11, 16-17 (5th Cir. 1972); *Plunkett v. Commissioner,* 465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Gajewski v. Commissioner,* 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); *Estate of Pittard v. Commissioner, supra.* Fraud is not to be imputed or presumed, but rather must be established by some independent evidence of fraudulent intent. *Beaver v. Commissioner,* 55 T.C. 85, 92 (1970); *Otsuki v. Commissioner,* 53 T.C. 96 (1969). However, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. *Spies v. United States,* 317 U.S. 492 (1943); *Rowlee v. Commissioner, supra; Stephenson v. Commissioner,* 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. *Stone v. Commissioner,* 56 T.C. 213, 223-224 (1971); *Otsuki v. Commissioner,* 53 T.C. at 105-106. The intent to conceal or mislead may be inferred from a pattern of conduct. See *Spies v. United States,* 317 U.S. at 499.

Courts have relied on a number of indicia of fraud in deciding section 6653(b) cases. Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence of fraud. *Solomon v. Commissioner,* 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam a Memorandum Opinion of this Court; *Beaver v. Commissioner,* 55 T.C. at 93.

A pattern of underreporting income over an extended period of time is indicative of fraud. *Foster v. Commissioner,* 391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue a Memorandum Opinion of this Court; *Brooks v. Commissioner,* 82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). However, the mere failure to report income is not sufficient to establish fraud. *Merritt v. Commissioner,* 301 F.2d 484, 487 (5th Cir. 1962). Fraud may not be found under "circumstances which at most create only suspicion." *Davis v. Commissioner,* 184 F.2d 86, 87 (10th Cir. 1950); *Katz v. Commissioner,* 90 T.C. 1130 (1988).

Respondent cannot rely on the taxpayer's failure to prove error in respondent's determination to meet his burden of proving fraud. *Habersham-Bey v. Commissioner,* 78 T.C. 304, 312 (1982); *Otsuki v. Commissioner,* 53 T.C. at 106; *Pigman v. Commissioner,* 31 T.C. 356, 370 (1958).

In *Bradford v. Commissioner,* 796 F.2d 303, 307 (9th Cir. 1986), affg. a Memorandum Opinion of this Court, the Ninth Circuit Court of Appeals gave a non-exclusive list of circumstantial evidence which may give rise to a finding of fraudulent intent. Such "badges of fraud" would include: (1) Understatement of income, (2) maintenance of inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of assets, and (6) failure to cooperate with tax authorities. The Ninth Circuit in *Bradford* further stated that the existence of the following facts supported our finding of fraudulent intent: (1) The taxpayer's engaging in an illegal activity, (2) his attempt to conceal such activity, (3) his dealing in cash, and (4) his failing to make estimated tax payments.

After a thorough examination of the record in this case, we conclude that petitioner intended to evade taxes which he knew he owed by conduct intended to conceal, mislead,

and prevent the collection of taxes. A number of the badges of fraud listed in *Bradford* are present here. As detailed in our findings, we have found that petitioner was engaged in illegally selling marijuana, from which he derived income in 1983 and 1984 of $1,737,650 and $1,938,492, respectively. Petitioner in fact admitted in the Florida forfeiture proceeding that $105,000 of the $612,712.42 was contraband. Petitioner filed no tax returns for the years in issue to report the receipt of this income. A repeated pattern of failure to report substantial amounts of income is evidence of fraudulent intent. *Gromacki v. Commissioner,* 361 F.2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; *Kalil v. Commissioner,* 271 F.2d 550 (5th Cir. 1959).

Petitioner did not file returns for 1982 through 1984 even though during those years he was actively engaged in drug dealing. His failure to file for 2 consecutive years although he received large amounts of income "is persuasive circumstantial evidence of fraud." *Marsellus v. Commissioner,* 544 F.2d 883, 885 (5th Cir. 1977).

Petitioner's repeated failure to file, coupled with failure to maintain or present records to respondent's agents is further evidence of an attempt to conceal income and manifests an intent not to pay the tax. *Grosshandler v. Commissoner,* 75 T.C. 1 (1980). Petitioner's prior history of filing tax returns indicates that he was well aware of his duty to file tax returns. See *United States v. McCabe,* 416 F.2d 957 (7th Cir. 1969), cert. denied 396 U.S. 1058 (1970) (taxpayer's filing of timely returns in prior years is evidence which permits the inference that he knew the law required him to file returns and that he intentionally failed to do so).

The unreported income here was from illegal sources, another circumstance which may be considered in the overall evaluation of petitioner's fraudulent intent. *Bradford v. Commissioner, supra.* In *Cappetta v. Commissioner,* T.C. Memo. 1985-76, we said:

> Other evidence of petitioner's intent to evade tax is reflected by the circumstances of the understatement. Petitioner was convicted of various crimes relating to his transactions with the New York City Board of Education.
>
> While evidence that a taxpayer was attempting to defraud another in a business transaction may not be direct evidence of fraud with intent to

evade tax, * * * , the Court is entitled to consider such evidence along with other evidence in determining the intent of the taxpayer in doing certain acts, because it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax.

McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976).

The activity here involves the selling of an illegal substance; this can be considered in determining whether he deliberately failed to report the receipt of income from this activity and to file returns for 1983 and 1984. In addition, to explain the $610,712 in cash found in his possession when he was arrested, petitioner told Gay that he was in the gold and jewelry business and needed large amounts of cash to buy gold. The record contains no evidence that petitioner ever was involved in any legal occupation other than truck driving. We find his gold business explanation totally implausible and another indicia of fraud. *Bradford v. Commissioner, supra.*

Additional badges of fraud present here are dealing in cash, failure to file estimated payments, and failure to cooperate with respondent's agent in his attempt to reconstruct petitioner's taxable income for the years in suit. *Bradford v. Commissioner, supra.*

The evidence produced by respondent here clearly and convincingly proves petitioner's fraudulent intent to evade taxes for both 1983 and 1984. The unreported income is the sole source of the deficiency. Accordingly, we are compelled to find petitioner liable for the addition to tax under section 6653(b)(1) and (2) for both years as determined by respondent.

4. *The section 6654 addition to tax*

Respondent also determined that petitioner is liable for additions to tax under section 6654 (failure to pay estimated income tax). Section 6654 imposes an addition to tax where there is an underpayment of estimated tax subject to exceptions that are inapplicable here. This section contains no provision relating to reasonable cause and lack of willful neglect. As petitioner failed to make any estimated tax

payments in 1983 and 1984, respondent's determination is sustained.

To reflect the foregoing,

*Decisions will be entered for the respondent.*

[1] 50 percent of the interest due on the deficiency.