# United States Tax Court

T.C. Memo. 2026-48

MOHAMMAD FAWAD ARYANPURE AND MALIKA ARYANPURE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 17120-23.                    Filed June 10, 2026.

————

*Kristin Martin Centeno*, *Sarah E. Green*, *Olla F. Jaraysi*, *Sarah L. Ray*, and *Gregory P. Rhodes*, for petitioners.

*Robert P. Brown*, *Christopher D. Bradley*, *Rebecca L. Holmes*, *Zachary T. King*, and *Justin B. Thomason*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

JENKINS, *Judge*: In a Notice of Deficiency (NOD) dated July 31, 2023, the Internal Revenue Service (IRS) determined federal income tax deficiencies and civil fraud penalties under section 6663[1] with respect to federal income tax returns filed jointly by petitioners, Mohammad Fawad Aryanpure (Dr. Fawad) and Malika Aryanpure (Dr. Malika), for tax years 2011, 2012, 2013, and 2014 (years at issue).

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

[*2]   The amounts determined were as follows:

| Year | Deficiency | § 6663 Penalty |
|------|-----------|----------------|
| 2011 | $183,053 | $137,290 |
| 2012 | 119,049 | 89,287 |
| 2013 | 107,550 | 80,663 |
| 2014 | 90,210 | 67,658 |

At trial, petitioners orally conceded the amounts of the adjustments for the years at issue. On brief, respondent conceded a portion of the adjustment for the 2014 tax year. Therefore, after concessions, the issues for decision are (1) whether civil fraud penalties under section 6663 are applicable with respect to either petitioner for the years at issue, (2) if so, whether that petitioner is entitled to reasonable cause relief under section 6664, and (3) whether the period of limitations for assessment of tax for the years at issue has lapsed.[2]

FINDINGS OF FACT

The parties have filed a First Stipulation of Facts and a First Supplemental First Stipulation of Facts, together with accompanying Exhibits. Furthermore, certain facts were deemed admitted before trial. The Stipulations of Facts, including the Exhibits attached thereto, the deemed admissions, and any Exhibits admitted at and after trial are incorporated by this reference. Petitioners resided in Alabama when they timely filed their Petition.[3]

I.   *Startup*

Petitioners were licensed medical doctors with limited business knowledge during the years at issue. However, petitioners were aware of their obligation to report all personal and business income for the years at issue. In March 2007, petitioners jointly formed MedExpress, LLC (MedExpress), to provide medical care and services. MedExpress is

---

[2] On brief, petitioners also argued that the Court was required to decide whether the civil fraud penalty under section 6663 can apply, given the lack of an opportunity for a jury trial, but acknowledged that the Court has decided in the affirmative in *Silver Moss Properties, LLC v. Commissioner*, 165 T.C. 37 (2025). This Opinion does not revisit that conclusion, and section 6663 penalties can apply in this case.

[3] Accordingly, unless otherwise agreed by the parties in writing, *see* § 7482(b)(2), venue for an appeal is the U.S. Court of Appeals for the Eleventh Circuit, *see* § 7482(b)(1)(A).

**[\*3]** a subchapter S corporation within the meaning of section 1361. During the years at issue, petitioners jointly owned the shares of MedExpress, and MedExpress owned the shares of MedExpress Properties, LLC. Petitioners were therefore required to take into account their pro rata share of income from the entities. *See* § 1366. After forming MedExpress, petitioners began separately conducting operations for two family medical clinics through MedExpress. Specifically, Dr. Fawad primarily operated the Bear Creek Family Clinic, and Dr. Malika primarily operated the Mitt Lary Family Clinic.

In 2008 petitioners hired Steve Richardson & Co. P.C. C.P.A.s (Accounting Firm) to provide accounting services, including preparing and filing business income tax returns for MedExpress and individual income tax returns for petitioners. Accounting Firm had experience preparing tax returns for medical practices. During the initial client meeting, Dr. Fawad met with certified public accountant and sole owner of Accounting Firm, Steve Richardson (Steve). During the initial meeting, Steve communicated his expectations to Dr. Fawad, including that his clients be "honest and ethical taxpayer[s]" and maintain "high quality books," which Accounting Firm could rely on during the preparation of tax returns.

After the initial meeting between Steve and Dr. Fawad, Steve's son David Richardson (David),[4] with assistance from Gina Allen, assumed responsibility for preparing income tax returns for MedExpress and petitioners. Accounting Firm also assisted MedExpress with setting up QuickBooks accounting software for recordkeeping purposes and retained a username and password to access the MedExpress QuickBooks records.

MedExpress used a Greenway electronic medical records system (Greenway) to track patient health records, as well as patient billing and payment data. Dr. Fawad initially testified that it was his understanding that David was "solely responsible for knowing and setting up everything," including Greenway. When pressed about whether David had actually set up Greenway, he reversed course and said: "No. He knew about it and he learned about it. And he set up the QuickBooks. So the two kind of, I believe, work together."

---

[4] Neither party called David to testify given his health issues at the time of trial.

**[\*4]** II.     *MedExpress Recordkeeping*

A.     *Daily Batch Sheets*

MedExpress accepted credit card, cash, and check payments for services, with cash payments generally received daily in the office but checks accepted only by mail and received less frequently. MedExpress implemented a paper-based log system, which used daily batch sheets to track cash payments, credit card payments, electronic fund transfers, and check payments mailed to MedExpress.

When front desk employees at MedExpress received cash from patients, they documented the payment on a batch sheet and stored the cash collected in the MedExpress cash drawer. MedExpress also received both checks from patients and checks from insurance companies by mail. Upon receipt, Dr. Fawad generally opened the mail and gave the checks to MedExpress employees to make copies and record the check payments on batch sheets. At the end of each day, batch sheet information was transferred into Greenway and the cash and checks collected were wrapped into the original batch sheet and provided to Dr. Fawad, who would then review the batch sheet and file it in his office file cabinet and, on at least some occasions, deposit the cash and checks at the bank.

B.     *Monthly Reconciliations*

Deposit transactions, along with other account transactions, were reported on monthly bank account statements. Petitioners received personal bank account statements and bank account statements for the MedExpress business bank account at their personal residence. Dr. Fawad brought MedExpress bank account statements to the office and gave them to MedExpress personnel to be reconciled in QuickBooks.

In 2011, MedExpress hired an office manager, Naomia Hogan, and an independent contractor, Tonya Hollingsworth. At the time she was hired by MedExpress, Ms. Hollingsworth had nearly a decade of experience using QuickBooks. She performed QuickBooks reconciliations for both the Bear Creek and the Mitt Lary offices. As part of her role, Ms. Hollingsworth visited the MedExpress Bear Creek location once per month to review MedExpress bank account statements and confirm that the transactions on the bank account statements were reflected in QuickBooks. The MedExpress bank account statements were placed in Ms. Hollingsworth's workstation in advance of her arrival. Ms. Hollingsworth occasionally consulted with Accounting Firm

[*5] as to the proper categorization of items entered into QuickBooks but generally did not feel the need to do so.

After Ms. Hollingsworth's departure in 2013, Ms. Hogan, who had been trained by Ms. Hollingsworth to use QuickBooks, took over responsibility for the QuickBooks reconciliations. Ms. Hogan testified that during her time reconciling QuickBooks, she was personally provided bank account statements by Dr. Fawad. After she completed the reconciliations, she would print a QuickBooks transaction report, attach the bank account statements to the report, and give the documents to Dr. Fawad.[5]

At trial, both Ms. Hollingsworth and Ms. Hogan testified that they received business bank account statements only to complete the QuickBooks reconciliations. They testified that they did not receive personal bank account statements from Dr. Fawad to take into account in the reconciliations. Neither did Ms. Hollingsworth and Ms. Hogan add any information from Greenway to QuickBooks. Ms. Hogan's understanding was that all information reported in Greenway—including electronic fund transfers, in-office cash payments, and checks mailed to MedExpress—should have been reflected on MedExpress bank account statements, which were relied upon to complete the QuickBooks reconciliation.

Dr. Fawad disputed Ms. Hollingsworth's and Ms. Hogan's testimony. He admitted that while he could not actually speak to what Ms. Hollingsworth received for the reconciliation, he believed she received more than just business bank account statements. Dr. Fawad also testified that he personally handed Ms. Hogan personal bank account statements in addition to MedExpress bank account statements. Notably, however, Dr. Fawad also stated that Ms. Hogan "had access to everything in the office" when asked to specify what was provided to her to complete the reconciliations. He did not explain why petitioners' personal bank account statements would have been in the office or how Ms. Hogan would have known to access them. And he provided any responses about personal bank account statements only after having first testified that he had no recollection of what was provided.

---

[5] Although Ms. Hogan's understanding that the bank account statements were received at the office is inconsistent with the addresses on those statements, it is explained by the fact that Dr. Fawad opened all the mail and provided the relevant statements to her.

**[\*6]**   Dr. Fawad's testimony is in direct conflict with credible testimony from Ms. Hollingsworth and Ms. Hogan, neither of whom had any particular interest in this case, and both of whom confirmed that they did not receive personal bank account statements from Dr. Fawad when undertaking QuickBooks reconciliations. Given the unconvincing nature of his testimony to the contrary, the Court concludes that Dr. Fawad knew that Ms. Hollingsworth and Ms. Hogan used only business bank account statements and not petitioners' personal bank account statements to prepare the QuickBooks records.

III.   *Banking Transactions for MedExpress and Petitioners*

Although Dr. Fawad initially testified at trial that he spent "zero amount of time" on the financial aspects of MedExpress,[6] he admitted that he was responsible for filing the batch sheets, which documented the MedExpress cash and check transactions, and that he frequently deposited MedExpress cash and checks at the bank. He deposited some of the cash and certain checks received into the MedExpress business bank account, some into petitioners' personal bank accounts, and "some away." Bank records for MedExpress and petitioners confirm that on more than 300 occasions during the years at issue, a portion of the MedExpress business receipts was deposited into petitioners' personal bank accounts—ranging from more than 50 times during 2014 to more than 100 times during 2011. And on most of those occasions, a portion of the MedExpress business receipts was also deposited into the MedExpress business bank account on the same day, often only minutes apart.

On one such occasion, on April 30, 2012, Dr. Fawad made a deposit of $850 of cash, a check payable to Bear Creek, and a check payable to Dr. Fawad personally into petitioners' personal bank account. The deposit slip shows a timestamp of 3:58 PM. On the same day, Dr. Fawad deposited 13 checks payable to MedExpress or Bear Creek into the MedExpress business bank account. The deposit slip shows a timestamp of 4:00 PM and shows that Dr. Fawad started to deposit the $850 of cash into the MedExpress business bank account before changing his mind, striking through the cash item on the MedExpress deposit slip. When asked to explain the reason for structuring deposits in such a manner, Dr. Fawad initially denied the action, but, after being

---

[6] On brief, petitioners argue that Dr. Fawad's response related only to a specific period. But not only was that not clear on his initial testimony; when he was subsequently asked to confirm, he did so without adding any temporal limitation.

[*7] confronted with bank transaction records, simply explained that he had "no particular reason" for doing so.

However, Dr. Fawad also confirmed his understanding that if he put money into his personal bank accounts, it would not show up on the MedExpress bank account statements. In addition to depositing MedExpress funds directly into petitioners' personal bank accounts, on several occasions, Dr. Fawad transferred funds between the MedExpress business bank account and a personal bank account because, according to Dr. Fawad, David had advised him that such transfers between accounts were acceptable.

The IRS determined that the following amounts were deposited into various accounts or not deposited into any account for the years at issue:

| Year | Total Deposits into MedExpress Bank Account | MedExpress Cash Deposited into Personal Bank Accounts | MedExpress Noncash Receipts Deposited into Personal Bank Accounts | MedExpress Cash Not Deposited |
|------|---------|---------|---------|---------|
| 2011 | $2,726,561 | $88,184 | $4,798 | — |
| 2012 | 2,827,366 | 77,350 | 43,591 | At least $17,861 |
| 2013 | 2,315,950 | 66,115 | 30,613 | At least $19,592 |
| 2014 | 2,224,971 | 93,055 | 73,802 | — |

Some of the checks deposited into petitioners' personal bank accounts were reflected in income reported on Forms 1099–MISC, Miscellaneous Income.

IV.    *Tax Return Preparation*

A.    *Generally*

1.    *Terms of Engagement*

On the basis of his initial conversation with Dr. Fawad, Steve believed that Dr. Fawad understood that Accounting Firm would rely on the MedExpress books and records, rather than bank account statements, to prepare income tax returns. Dr. Fawad confirmed that his understanding was that Accounting Firm used Forms 1099— including Forms 1099–MISC and Forms 1099–K, Merchant Card and

[*8] Third Party Network Payments—issued to MedExpress; QuickBooks; and all other financial information provided to prepare the income tax returns. Consistent with that understanding, engagement letters between Accounting Firm and MedExpress for the years at issue state that Accounting Firm (1) will prepare tax returns on the basis of information furnished by MedExpress and (2) will not audit or otherwise verify the data submitted by MedExpress. The engagement letters further notify MedExpress that it is responsible for providing all the information required for the preparation of complete and accurate tax returns, that it has the final responsibility for the income tax returns, and, therefore, that the returns should be reviewed carefully before they are signed. The engagement letters further state that Accounting Firm's "work in connection with the preparation of [the MedExpress] income tax returns does not include any procedures designed to discover defalcations and/or other irregularities, should any exist." They add: "We will render such accounting and bookkeeping assistance as determined to be necessary for preparation of the income tax returns."

### 2. *Overall Process*

For the years at issue, David, with assistance from Ms. Allen, prepared income tax returns for petitioners and MedExpress, while Steve retained responsibility for completing a final review and signing the income tax returns. Ms. Allen's responsibilities related to the preparation of the MedExpress income tax return included "gather[ing] the information and request[ing] additional information that might be needed, based on prior year return work, or any other information [Accounting Firm] might need to know or think . . . might be missing." Ms. Allen confirmed that Accounting Firm had access to the MedExpress QuickBooks records and generally relied on QuickBooks records as a starting point for preparing income tax returns. Accounting Firm reconciled the QuickBooks records by confirming that the amounts reported in QuickBooks were consistent with the business bank account statements. However, as discussed in more detail with respect to each individual year at issue, the gross receipts reported on the returns prepared were ultimately not amounts reflected in QuickBooks, although QuickBooks information was used for expenses.

### 3. *Collection of Information*

Accounting Firm communicated with bankers for petitioners and MedExpress and third-party payroll representatives as needed to obtain information to prepare the MedExpress income tax returns. Accounting

[*9] Firm did not regularly request or receive petitioners' personal bank account statements or information from Greenway. However, Accounting Firm did request from MedExpress and petitioners Forms 1099, business bank account statements, and any other relevant information petitioners and MedExpress had received. It was understood that patient payments made to MedExpress by cash or personal check would not be reflected on Forms 1099 issued to MedExpress. Accounting Firm took the information provided by petitioners and MedExpress at "face value."

### 4. *Greenway*

Steve testified that he had never seen a Greenway report, either for MedExpress or for any other medical practice client of Accounting Firm. In 2012, Ms. Hogan did fax Greenway reports to David. However, the reports followed a summary that she prepared setting forth annual income for the 2008 through 2011 years. And Ms. Hogan testified: "[I]f I was told to give Mr. Richardson an annual total for these years, then I would also print something from Greenway where I get the total from." Dr. Fawad testified, on the basis of "[y]ears of reassurance," that his understanding was that Accounting Firm had access to the Greenway system. Given Dr. Fawad's inconsistent testimony about who was responsible for setting up Greenway and the vagueness of his testimony about Accounting Firm's nevertheless having access to it, the Court concludes that Dr. Fawad was aware that Accounting Firm did not access Greenway and would have information from it only if MedExpress provided Greenway reports.

### B. *2011 Tax Year*

For the 2011 tax year, MedExpress QuickBooks records show "Total Income" of $2,509,533, and that amount was reported as gross receipts on the MedExpress 2011 Form 1120S, U.S. Income Tax Return for an S Corporation. That amount excluded amounts deposited into the MedExpress business bank account in December 2011, which were reflected in 2012, but included amounts that were nontaxable. In 2013, an amended Form 1120S for the MedExpress 2011 tax year was filed, with Accounting Firm explaining that "[p]ursuant to an error discovered in the preparation of the 2012 income tax return [Accounting Firm] conducted an audit of revenues for the Tax Year 2011." More specifically, Accounting Firm explained, loan proceeds received by MedExpress had been erroneously treated as revenue, resulting in overstated revenues of $618,928. The MedExpress amended Form 1120S for the 2011 tax

[*10] year reported gross receipts of $1,890,605. Dr. Fawad signed the amended Form 1120S as managing member of MedExpress, and Accounting Firm filed it. The parties agree that the original 2011 tax return was based on QuickBooks records and that the amended 2011 tax return was also based on such records, with adjustments.[7]

C.    *2012 Tax Year*

For the 2012 tax year, MedExpress QuickBooks records show "Total Income" of $2,963,943. This includes nontaxable transfers into the MedExpress business bank account.

On April 9, 2013, in an email to Dr. Fawad, Ms. Allen asked Dr. Fawad to "[p]lease bring the following to your appointment" and provided an itemized list of information needed for the 2012 personal income tax return, concluding with a request for "[a]ny other income or deductions that you believe might affect your taxes." The list did not contain a request for personal bank account statements. In response, on April 11, 2013, Dr. Fawad replied:

David and Gina

according to my quickbooks , and all the 1099 for all the payees in 2012 (originals submitted to you), our gross for 2012 is $2,289,865, according to our quickbooks, our total expenses are $1,479,236, leaving a net of $810628, which is more consistant [sic] with the money in the bank, please reveiw [sic] your info and let me know , thanks. fawad.

Consistent with the foregoing email, the MedExpress Form 1120S for the 2012 tax year reports gross receipts of $2,289,864.

D.    *2013 Tax Year*

For the 2013 tax year, MedExpress QuickBooks records show "Total income" of $1,000,623. The QuickBooks records reduce deposits by $1,050,000 of "Owner Distributions" to petitioners. An undated handwritten document itemizes the Forms 1099 received by MedExpress for the 2013 tax year. Although Dr. Fawad was not asked about the document, other witnesses testified credibly that they did not

---

[7] The testimony was conflicting, and the parties disagree, as to who— Dr. Fawad or Accounting Firm—initiated the amendment to the return, but it is unnecessary for the Court to reach a conclusion on that issue.

[*11] recognize the handwriting as that of anyone else who would have been in a position to create it. Ms. Allen recognized an annotation about rents as being in her handwriting. In addition to the Form 1099 amounts, the handwritten document reports cash of $3,600, as compared to at least $171,162 in cash payments reflected on MedExpress batch sheets for the 2013 tax year. The handwritten document shows a grand total of $2,178,647.

A QuickBooks report for 2013 dated February 23, 2014, shows "Total Income" of $982,761. It contains the following handwritten annotation in Ms. Allen's handwriting: "Per client (1099-MISC sum) should be $2,178,647." The annotated report also shows a "CPA Adj" (presumably meaning adjustment) reducing the total by an amount identified as "rental 1099" and shows a revised total of $2,163,210.[8] The same number is reflected as "Total Medical Gross Receipts on Form 1120S, Line 1a" at the bottom of a worksheet that has a column entitled "2013 Clinic Gross Receipts per Client's Worksheet," corresponding to the handwritten tabulation of Forms 1099. On September 4, 2014, Ms. Allen emailed David, referencing a computation of MedExpress gross receipts made by Dr. Fawad and adjustments to it by her, including for rental income. The MedExpress Form 1120S for the 2013 tax year reports gross receipts of $2,163,210.

The parties dispute when and by whom the various documents were created. It is not clear whether the worksheet was prepared before the filing of the 2013 tax return or in connection with the examination. However, given the date on the annotated QuickBooks report, and correspondence of the numbers on those documents to each other and to the amount reported on the 2013 tax return, this Court determines that the handwritten document and the annotated QuickBooks report were prepared before the filing of the 2013 tax return. Moreover, given the clear conflict between the income reflected on the annotated QuickBooks report and the income number reported, this Court concludes that the handwritten document was prepared by Dr. Fawad to be relied upon by Accounting Firm for MedExpress income, as in fact happened.

E.    *2014 Tax Year*

For the 2014 tax year, the MedExpress QuickBooks records show "Total Income" of $1,926,773. This amount includes nontaxable deposits

---

[8] The documents described herein reflect computational errors and adjustments that are irrelevant to the Court's consideration.

[*12] made into the MedExpress business bank account. The records also reduce deposits by $210,000 of "Owner Distributions" to petitioners. An undated document itemizes the Form 1099 amounts received by MedExpress for the 2014 tax year. In addition to the Form 1099 amounts, the document contains a handwritten summation reporting insurance payments of $1,884,971 and other amounts, including cash, of $120,690, for a grand total of $2,005,661. The handwriting is not Ms. Allen's and appears similar to that on the handwritten tabulation of Forms 1099 for the 2013 tax year. The parties dispute who created the document, but the Court determines, as respondent argues, that it was prepared by Dr. Fawad. The MedExpress Form 1120S for the 2014 tax year reports gross receipts of $2,005,661.

V.    *IRS Examination*

In March 2014, the IRS initiated an examination for the MedExpress 2011 tax return. Revenue Agent Magen Cheek Leadbetter (RA Leadbetter) was assigned to review the MedExpress amended 2011 Form 1120S. The audit was eventually expanded to include the MedExpress 2012, 2013, and 2014 Forms 1120S. During early periods of the examination, Steve served as representative for MedExpress and petitioners, and David and Ms. Allen were appointees for MedExpress. As part of the examination, RA Leadbetter issued information document requests and received certain information and documents in response. RA Leadbetter testified that the IRS received information, including bank account statements, in a piecemeal fashion, and that not all bank account statements requested were provided. However, Dr. Fawad testified that he was not contacted directly for information and that information requests went to Accounting Firm and perhaps his staff. Dr. Fawad instructed his staff to cooperate fully with the examination and answered all questions that he was asked during his voluntary audit interviews.

In October 2014, RA Leadbetter issued summonses for records from financial institutions for MedExpress and petitioners. She analyzed bank deposits using the bank records received and prepared bank deposit analyses addressing, among other items, (1) deposits into and withdrawals from the MedExpress business bank account, (2) deposits into and withdrawals from petitioners' personal bank accounts, and (3) cash summaries prepared by MedExpress during the course of the examination on the basis of the daily batch reports. On the basis of the bank deposit analyses, RA Leadbetter noticed that during the years at issue a large number of business-related deposits had been

[*13] made directly into petitioners' personal bank accounts. On the basis of her analyses, RA Leadbetter agreed that adding the amounts of cash and checks received by MedExpress to the amounts of income reflected on the Forms 1099 that it received would have resulted in a generally accurate computation of the MedExpress gross receipts and that that would have been a logical way for Accounting Firm to compute MedExpress income "if the taxpayer provided those numbers."

In addition to the bank deposit analyses, RA Leadbetter prepared a reconciliation using the IRS Information Returns Processing (IRP) system, which receives and validates data submitted by employers and other third parties, such as data reported on Forms 1099.

VI.     *Gross Receipts by Information Source*

The following table summarizes the gross receipts determined for the years at issue based on each potential source of information concerning gross receipts:

|  | *2011* | *2012* | *2013* | *2014* |
|---|---|---|---|---|
| *QuickBooks "Total Income"* | $2,509,533 | $2,963,943 | $1,000,623 | $1,926,773 |
| *Form 1120S Gross Receipts* | 2,509,533 | 2,289,864 | 2,163,210 | 2,005,661 |
| *Amended Form 1120S Gross Receipts* | 1,890,605 | — | — | — |
| *Gross Receipts on Forms 1099 per IRP Reconciliation* | 2,129,132 | 2,297,260 | 2,158,471 | 2,003,640 |
| *Gross Receipts per Bank Deposit Analysis*[9] | 2,432,033 | 2,583,768 | 2,432,270 | 2,226,828 |

Ultimately, on the basis of the bank deposit analyses, the IRS determined that the MedExpress gross receipts were underreported by $541,428, $293,904, $269,060, and $221,167 for 2011, 2012, 2013, and 2014, respectively. The IRS issued an NOD to petitioners determining deficiencies with respect to their individual income tax returns for the years at issue resulting from their pro rata shares of increased income from the adjustments with respect to the MedExpress Forms 1120S.

---

[9] The bank deposit analyses prepared by RA Leadbetter generally accounted for nontaxable sources including bank transfers between accounts and loans.

**[\*14]** VII.   *Expert Testimony*

Petitioners' expert, J. Lester Alexander, was recognized by the Court as an expert in accounting and tax preparation standards. Mr. Alexander has more than 40 years of experience as a certified public accountant and specializes in forensic accounting and fraud assessment. Mr. Alexander was engaged to perform a retrospective fraud investigation and analysis. Mr. Alexander's report relied on interviews with Dr. Fawad and Ms. Hogan and data and information produced by Accounting Firm, the IRS, and MedExpress. Mr. Alexander did not conduct interviews with Steve, David, or Ms. Allen.

Mr. Alexander's report, in relevant part, expresses the following findings and opinions:

> 4. . . . [Accounting Firm] failed to exercise due professional care, as required by the Paid Preparer Rules, by not obtaining sufficient relevant information.
>
> 5. Petitioners utilized their general ledger to accurately track MedExpress' expenses which is customary. However, petitioners did not use their general ledger to accurately track revenue. The revenue amounts in the general ledger are the result of summary level general ledger entries and do not appear to be derived in customary fashion from medical billing records.
>
> 6. . . . [Greenway] was the most accurate record of MedExpress' revenue. . . .
>
> . . . .
>
> 9. . . . [Greenway] was the proper record to use as the source for revenue reported in the income tax returns for the [years at issue]. . . .
>
> . . . .
>
> 11. . . . The tax preparation working papers confirm that [Greenway] was not used by [Accounting Firm] as the source for the revenue reported on the income tax returns for the [years at issue].

[*15] Mr. Alexander's report further opines that, had Accounting Firm used Greenway records, it is likely that revenue would have been properly reported for the years at issue. It also opines that there are no indicators of taxpayer fraud nor tax preparer fraud. Mr. Alexander elaborated at trial that he was not applying standards applicable under section 6663.

At trial, Mr. Alexander suggested that Accounting Firm should have used Greenway to determine the income of MedExpress and that Accounting Firm should have reconciled the QuickBooks records against information reported in Greenway. However, he did not know who had access to the MedExpress Greenway system and only knew Accounting Firm to have had access to some reports from the Greenway system. When specifically asked, after questioning about the sensitive patient information contained within systems such as Greenway, whether it was his experience that accounting professionals have access to patient billing systems, he said: "It's my experience that CPAs have access to the revenue reports you run off those systems." He also testified that what caused the errors in the MedExpress returns was Accounting Firm's reliance on only Forms 1099.

## OPINION

### I.    *Deficiency Determinations*

Generally, the Commissioner's determinations in an NOD are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). At trial, petitioners conceded the underpayments for the years at issue; therefore, respondent's burden of proof with respect to the deficiency determinations for the years at issue has been satisfied.

### II.    *Civil Fraud Penalties*

#### A.    *Burden of Production*

Respondent determined that petitioners are liable for section 6663(a) fraud penalties for all years at issue. The Commissioner bears the burden of production with respect to an individual taxpayer's liability for any penalty, requiring the Commissioner to come forward with sufficient evidence indicating that the imposition of the penalty is appropriate. *See* § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001).

**[\*16]** As part of that burden, respondent must produce evidence of compliance with the procedural requirements of section 6751(b)(1). *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016); *see also Clay v. Commissioner*, 152 T.C. 223, 246 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021). Section 6751(b)(1) requires the initial determination of certain penalties to be "personally approved (in writing) by the immediate supervisor of the individual making such determination." The Court determined, by order dated June 18, 2025, that the requirements of section 6751(b) have been satisfied for each tax year at issue with respect to the assertion of the civil fraud penalties under section 6663.

B.  *Section 6663 Generally*

Section 6663(a) imposes a penalty of 75% of the portion of any underpayment of tax required to be shown on a return that is attributable to fraud. Fraud is never imputed or presumed. *See Parks v. Commissioner*, 94 T.C. 654, 660 (1990). Rather, "[t]he existence of fraud is a question of fact to be resolved upon consideration of the entire record." *Petzoldt v. Commissioner*, 92 T.C. 661, 699 (1989). The Commissioner bears the burden of proof by clear and convincing evidence. § 7454(a); Rule 142(b); *see Petzoldt*, 92 T.C. at 699.

Fraud is the intentional wrongdoing of a taxpayer to evade tax believed to be owing. *See Petzoldt*, 92 T.C. at 698. To establish fraud, the Commissioner must prove that (1) an underpayment of tax exists for the relevant year and (2) the taxpayer "intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." *Id.* at 699; *see also Holland v. United States*, 348 U.S. 121, 139 (1954); *United States v. Murdock*, 290 U.S. 389, 396 (1933); *Langille v. Commissioner*, 447 F. App'x 130, 134 (11th Cir. 2011), *aff'g* T.C. Memo. 2010-49; *DiLeo v. Commissioner*, 96 T.C. 858, 874 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992). Because petitioners have conceded the underpayment of tax for each year at issue, respondent has satisfied the first element of the fraud penalty. Therefore, this Court must now determine whether any portion of any underpayment is attributable to fraudulent intent. *See DiLeo*, 96 T.C. at 874.

Because direct evidence of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. *See Spies v. United States*, 317 U.S. 492, 499 (1943); *Bradford v. Commissioner*, 796 F.2d 303, 307 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. The

[*17] taxpayer's entire course of conduct may be examined to establish the requisite intent. *See Stone v. Commissioner*, 56 T.C. 213, 224 (1971); *Otsuki v. Commissioner*, 53 T.C. 96, 106 (1969).

Courts usually rely on several nonexclusive indicia or "badges" of fraud to find circumstantial evidence of fraud. *See Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992); *DiLeo*, 96 T.C. at 874–75. These badges of fraud include (1) understating income; (2) failing to maintain adequate records; (3) offering implausible or inconsistent explanations of behavior; (4) concealing income or assets; (5) failing to cooperate with tax authorities; (6) engaging in illegal activities; (7) providing incomplete or misleading information to the taxpayer's tax return preparer; (8) offering false testimony or testimony that lacks credibility; (9) filing false documents, including filing false income tax returns; (10) failing to file tax returns; and (11) engaging in extensive dealings in cash. *See Recklitis v. Commissioner*, 91 T.C. 874, 910 (1988); *Vanover v. Commissioner*, T.C. Memo. 2012-79, 2012 WL 952871, at *4. The existence of any one badge is not dispositive, but the existence of several badges may be persuasive circumstantial evidence of fraud. *Niedringhaus*, 99 T.C. at 211.

If the Commissioner establishes that any portion of the underpayment is attributable to fraud, then the entire underpayment is treated as due to fraud unless the taxpayer can establish by a preponderance of the evidence that some portion of it is not attributable to fraud. § 6663(b). However, in the case of a joint return, the fraud penalty does not apply with respect to a spouse unless some part of the underpayment is due to the fraud of the spouse. § 6663(c). In addition, no fraud penalty may be imposed with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. § 6664(c)(1).

C.    *Fraud Analysis*

Respondent argues that petitioners' fraudulent intent is demonstrated by several badges of fraud, including understating income, failing to maintain adequate records, offering implausible or inconsistent explanations of behavior, concealing income, providing incomplete or misleading information to Accounting Firm, and filing false income tax returns. As discussed herein, this Court agrees with respect to Dr. Fawad but not Dr. Malika.

18

**[\*18]**     1.     *Understatement of Income*

A "consistent and substantial understatement of income is, by itself, strong evidence of fraud." *Marcus v. Commissioner*, 70 T.C. 562, 577 (1978), *aff'd*, 621 F.2d 439 (5th Cir. 1980) (unpublished table decision); *see also Korecky v. Commissioner*, 781 F.2d 1566, 1568 (11th Cir. 1986), *aff'g per curiam* T.C. Memo. 1985-63. Petitioners concede the understatements of income for the years at issue. Although they argue that respondent has not established an understatement beyond the years at issue, just two years has been found to reflect consistency. *See Kelley v. Commissioner*, T.C. Memo. 1991-324, *aff'd*, 988 F.2d 1218 (11th Cir. 1993) (unpublished table decision). Petitioners also argue that the understatements for 2012 through 2014 range from 11% to 13% of the correct gross receipts, which is not substantial within the meaning of section 6501(e). Of course, section 6501(e) is not relevant to the analysis at issue. Moreover, not only is the understatement for the 2011 tax year much more substantial in relative terms; the understatements for all of the years at issue are substantial in absolute terms, given that they all are in the hundreds of thousands of dollars. And an understatement of upwards of ten percent is no mere rounding error. The significance of the understatements—both in absolute terms and relative to the income reported—and the fact that they continued over four consecutive years both favor a finding of fraudulent intent.

2.     *Failure to Maintain Adequate Books and Records*

Fraudulent intent can be inferred from a failure to maintain adequate books and records. *See Estate of Temple v. Commissioner*, 67 T.C. 143, 162 (1976). The Court has found as much when a taxpayer's "conduct was intimately entwined with the inaccurate recording of his business income," noting the taxpayer's clear awareness of customs for making accounting entries and his penchant for volunteering information to be used for accounting, in addition to handling business receipts in a manner to prevent their being recorded. *Id.*

As evidenced by the need to resort to bank deposit analyses to determine the income of MedExpress and petitioners, Dr. Fawad's system for QuickBooks maintenance ensured that MedExpress failed to maintain adequate records. Petitioners argue that the MedExpress books and records were professionally prepared and adequately documented all payments and expenses. Specifically, they argue that they did maintain adequate records in the form of the batch sheets that MedExpress provided to RA Leadbetter for her examination. Although

[*19] the batch sheets apparently were an accurate record of certain payments received by MedExpress, they do not represent a complete, accurate, and comprehensive set of books and records reflecting all of MedExpress's income and expenses from various sources. And even petitioners' own expert testified that, on the basis of his investigation, the MedExpress QuickBooks records were incomplete.

The incompleteness of the QuickBooks records is a result not only of Dr. Fawad's diversion of business receipts into petitioners' personal bank accounts and "away," but also of his choice to provide only business bank statements to his staff for entry into QuickBooks. And the QuickBooks records were rendered even more unreliable by their incorrect treatment of amounts, including (1) reporting of income amounts for 2011 in 2012, (2) categorization of certain nontaxable transfers as income in multiple years, an instance of which was acknowledged in the explanation of the 2011 amended tax return, and (3) treatment of distributions to petitioners in multiple years as reducing income. Petitioners add yet another party to the list of those allegedly to blame for their reporting failures, attributing at least some of these errors to their bank's categorization of transactions on bank account statements. However, Dr. Fawad chose to assign QuickBooks reconciliation as a rote task to, first, an independent contractor who came to the office only occasionally and otherwise had no involvement with the business, and then an office manager with no prior accounting experience. Those choices no doubt contributed to the affirmative errors in the preparation of the QuickBooks records, as well as the failure to consider the possibility of omissions resulting from Dr. Fawad's conduct. Particularly given that Dr. Fawad was on notice from his initial meeting with Steve and from the engagement letters that he was expected to ensure that MedExpress maintained accurate books and records, the failure to do so is indicative of fraudulent intent.

3. *Giving Implausible or Inconsistent Explanations of Behavior and Testimony That Lacks Credibility*

A taxpayer's implausible or inconsistent explanations for his actions may constitute circumstantial evidence of fraudulent intent. *See Vanover v. Commissioner*, 2012 WL 952871, at *8. For example, the Court has found as much in the case of noncredible testimony by a taxpayer that he did not understand that there was a difference between himself and his business, *id.*, and that he was ignorant of the inaccuracy of business records despite being responsible for business deposits, *Bahoric v. Commissioner*, T.C. Memo. 1963-333.

[*20] Dr. Fawad's testimony was evasive and lacked credibility. Dr. Fawad repeatedly indicated that he could not recall aspects of the MedExpress operations and qualified statements about them by suggesting that he had limited knowledge. However, contrary to Dr. Fawad's testimony that he spent "zero amount of time" on the financial aspects of MedExpress, he acknowledged that he was responsible for opening all of the mail, providing statements to staff for QuickBooks entry, reviewing and filing batch sheets, and making cash and check deposits at the bank. And his implied lack of involvement in the preparation of tax returns and familiarity with their contents is belied by the emails and annotated information that he sent to Accounting Firm for preparation of the tax returns during the years at issue, which clearly cabin the information to be considered by Accounting Firm to limit it to a subset of the income of MedExpress. And those actions render highly implausible Dr. Fawad's stated belief that QuickBooks reflected all of the MedExpress income.

Furthermore, Dr. Fawad went from denying making deposits into business and personal bank accounts on the same day to acknowledging it but giving the implausible and inconsistent explanations of having no particular reason for doing so and being permitted to transfer money between the accounts. In support of the notion that Greenway could have been used in tax return preparation, he also meandered between (1) asserting that Accounting Firm had set up Greenway, (2) acknowledging that it had not but asserting that it had access to the system (even though his own expert would not opine that such an arrangement would be customary), and (3) indicating that his understanding was that QuickBooks and Greenway worked together.

All of these inconsistent and implausible explanations and the general lack of credibility of Dr. Fawad's testimony support an inference of fraudulent intent.

4. *Concealing Income or Assets*

Fraudulent intent to evade tax may be inferred from the "concealment of assets or covering up sources of income." *Spies*, 317 U.S. at 499. The Court has found that taxpayers who diverted business receipts into personal bank accounts, and whose return preparer used only business records to prepare their return, concealed the diverted income with fraudulent intent. *See, e.g., Le v. Commissioner*, T.C. Memo. 2020-27, at *34; *Seidenfeld v. Commissioner*, T.C. Memo. 1995-62, 1995

**[\*21]** WL 44586, at \*8; *Anderson v. Commissioner*, T.C. Memo. 1995-8, 1995 WL 9181, at \*20–21.

Dr. Fawad similarly concealed income of MedExpress by diverting some of it from the business bank account and into petitioners' personal bank accounts and "away." Dr. Fawad offered no explanation for his actions, stating only that it was money that he earned and he had "no particular reason" for structuring banking transactions in that manner. Meanwhile, he also transferred money from the business bank account to petitioners' personal bank accounts, supporting an understanding that the separate deposits were not simply a method of cash management but an affirmative act of concealment.

Citing Mr. Alexander's report, petitioners argue that Dr. Fawad's actions with respect to the cash and check deposits were not evidence of fraudulent intent because it is "standard and recommended" for small business owners to handle their own cash deposits. However, it is certainly not "standard and recommended" to commingle personal and business funds, and this Court finds that Dr. Fawad's actions indicate fraudulent intent.

5. *Providing Incomplete or Misleading Information to Tax Return Preparer*

A taxpayer's provision of incomplete or misleading information to his return preparer—in particular, his concealment of gross income—provides strong circumstantial evidence of fraudulent intent. *See Korecky v. Commissioner*, 781 F.2d at 1568; *Vanover v. Commissioner*, 2012 WL 952871, at \*5. The Court has specifically cited a medical professional's failure to provide his tax return preparer with information about patient copayments made in cash and by check as evidence of fraudulent intent. *See Kohan v. Commissioner*, T.C. Memo. 2019-85, at \*24. And the Court has cited as indicative of fraudulent intent medical professionals' failure to provide accurate information to a tax return preparer that they knew relied on the accuracy of the information they provided. *See Ghadiri-Asli v. Commissioner*, T.C. Memo. 2019-142, at \*13, \*45, *aff'd sub nom. Najle-Rahim v. Commissioner*, No. 20-72031, 2022 WL 2869776 (9th Cir. July 21, 2022).

Dr. Fawad provided incomplete and misleading information to Accounting Firm. Dr. Fawad knew that Accounting Firm had access to his QuickBooks records and, having worked with Accounting Firm for several years, including for the 2011 tax year, that Accounting Firm

**[\*22]** consulted those records even though adjustments to them were warranted. Dr. Fawad knew that Ms. Hollingsworth and Ms. Hogan used only business bank account statements, and not petitioners' personal bank account statements, to prepare the QuickBooks records. He also knew that the MedExpress bank account statements would not show any money he had deposited into petitioners' personal bank accounts.

Furthermore, Dr. Fawad, having signed engagement letters indicating that Accounting Firm would prepare tax returns based on information furnished by MedExpress and would not audit or otherwise verify the data submitted by MedExpress, did not volunteer petitioners' personal bank account statements.[10] Dr. Fawad was aware that Accounting Firm did not access Greenway, which petitioners' expert argued was the proper source for revenue computations. Instead, Dr. Fawad, who was heavily involved with the MedExpress financial operations and procedures, restricted the information to be considered by Accounting Firm, providing only a subset of the information available, in the form of Forms 1099, incomplete QuickBooks records, and limited, unsubstantiated additional information.

Specifically, for 2011, Accounting Firm used QuickBooks information adjusted for nontaxable loan amounts to prepare the amended tax return. For 2012, in response to an inquiry from Ms. Allen asking for all relevant information, Dr. Fawad gave a gross income number "according to my quickbooks, and all the 1099," and asserted that the supplied numbers were "consistant [sic] with the money in the bank." For 2013, Dr. Fawad told Accounting Firm that MedExpress had received $3,600 of cash, a fraction of that actually received. And he similarly provided Accounting Firm with amounts to be used, including cash, in preparing the 2014 tax return.

---

[10] On brief, petitioners argue that this Court should presume that David's testimony would not have supported respondent's claim that Accounting Firm "was prevented from accessing the bank accounts or any other documentation." They cite in support thereof *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947), and the well-established rule "that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." However, petitioners could also have called David if they thought his testimony would be particularly relevant, which it would not be on this question, given that the issue is not whether Accounting Firm could have accessed the materials that they did not access. This Court will not draw any presumptions about potential testimony by David.

**[\*23]** Dr. Fawad was aware that the additional information that he provided, having been taken by Accounting Firm at "face value," ended up reported on the returns that he signed. Accordingly, not only did Dr. Fawad provide incomplete information to his tax return preparer, but he also made affirmative efforts to provide misleading information to be relied upon by those preparers. All of these facts support a finding of fraudulent intent.

### 6.    *Filing False Documents*

Filing false documents with the IRS supports a finding of fraudulent intent. *Stephenson v. Commissioner*, 79 T.C. 995, 1007 (1982), *aff'd per curiam*, 748 F.2d 331 (6th Cir. 1984). Petitioners have conceded the amounts of the understatements on their returns, which, as discussed *supra* Opinion Part II.C.1, reflect significant omissions of income, supporting fraudulent intent. *See Harrington v. Commissioner*, T.C. Memo. 2021-95, at \*39–40, *aff'd*, No. 22-9000, 2022 WL 17333080 (10th Cir. Nov. 30, 2022); *cf. Beleiu v. Commissioner*, T.C. Memo. 2025-70, at \*13. Dr. Fawad knowingly and intentionally omitted significant amounts of income from MedExpress in filing those returns.

Petitioners argue that understatements of income are not necessarily sufficient to conclude that returns were filed with an intent to evade tax, citing *Hoyal v. Commissioner*, T.C. Memo. 2024-84, at \*23. However, in that case, the Court determined that "the Commissioner agrees that [the taxpayers] did not file false documents." *Id.* By contrast, the Court has concluded on facts like those at hand that a taxpayer did file a false document, supporting a finding of fraudulent intent. *See Harrington*, T.C. Memo. 2021-95, at \*39–40; *Seidenfeld v. Commissioner*, 1995 WL 44586, at \*8; *Anderson v. Commissioner*, 1995 WL 9181, at \*20–21. So too, here, the false returns for the years at issue support a finding of fraudulent intent.

### 7.    *Other Badges of Fraud*

Petitioners argue that they cooperated with the IRS examination, with Dr. Fawad answering all questions during interviews and instructing Accounting Firm and his staff to provide all necessary documents, and petitioners signing an extension of the period of limitations for the 2011 tax year. Although the Court does not find a lack of cooperation with the IRS supporting a finding of fraudulent intent, neither does the cooperation negate the badges identified. Petitioners argue that their cooperation should be positively considered, in reliance

**[\*24]** on *Gould v. Commissioner*, 139 T.C. 418 (2012), *aff'd*, 552 F. App'x 250 (4th Cir. 2014). However, in that case, unlike in this one, the Commissioner argued that the taxpayers' failure to cooperate with authorities was evidence of fraudulent intent. *Id.* at 448. Consistent with petitioners' arguments in this case, the Court in *Gould* did indicate that, given that the taxpayers apparently cooperated with the examination and signed an extension of the period of limitations, the taxpayers could not be said to have failed to cooperate with tax authorities. *Id.* Moreover, the Court cited the taxpayers' cooperation as indicative that they did not have fraudulent intent. *Id.* at 452. However, the Court simultaneously cited the taxpayers' disclosure of their positions on the tax returns, pointing to both collectively as evidence that the taxpayers were simply incorrect in those positions rather than attempting to commit fraud. *Id.* By contrast, in this case, the tax returns for the years at issue gave no indication of petitioners' fraudulent actions, and Dr. Fawad's cooperation in the examination is not consistent with his behavior in connection with preparing and filing the returns for the years at issue. It therefore does not undermine the foregoing indicia of fraud.

Petitioners also argue that their advanced levels of education should not be held against them in assessing whether they had fraudulent intent. As discussed herein, this Court has not found Dr. Fawad to be particularly credible. However, his lack of credibility is not due to his education and potential business acumen, but rather due to the internal inconsistency of his testimony and its conflict with that of disinterested witnesses concerning relatively basic matters. Accordingly, this Court has not held petitioners to "a higher or lower standard" than other taxpayers in assessing their intent. *See Rao v. Commissioner*, T.C. Memo. 1996-500, 1996 WL 637881, at \*7.

### 8. *Conclusion*

Petitioners argue that Dr. Fawad's depositing MedExpress funds into petitioners' personal bank accounts is irrelevant to the question of fraud given that Accounting Firm did not base its reporting on the QuickBooks records. However, that argument goes to whether the underpayments were attributable to fraudulent intent, as discussed *infra* Opinion Part II.D, and not to whether there was fraudulent intent to begin with. Petitioners further argue that respondent's position relies on such deposits to establish fraudulent intent, and they cite *Hoyal*, T.C. Memo. 2024-84, at \*17, for the proposition that a single act cannot support multiple badges of fraud. However, in addition to the personal

[*25] bank account deposits' having occurred on numerous occasions in each year at issue, the multiple other actions and statements by Dr. Fawad discussed herein as supportive of fraudulent intent bely that argument.

Although Dr. Malika jointly filed with Dr. Fawad the false tax returns that reflected a consistent and substantial understatement of income, satisfying two badges of fraud, this Court understands Dr. Fawad alone to have been responsible for the inadequate books and records maintained by MedExpress and the concealment of MedExpress income. Similarly, Dr. Fawad alone provided incomplete and misleading information to Accounting Firm and made implausible and inconsistent explanations of everything from MedExpress systems to his personal actions with respect to MedExpress income. Accordingly, having considered the entire record and the indicia discussed herein, this Court concludes that respondent has established fraudulent intent on the part of Dr. Fawad for each of the years at issue but not on the part of Dr. Malika for any of the years at issue. Accordingly, Dr. Malika is not liable for section 6663 penalties. *See* § 6663(c).

D.    *Cause of Underpayment*

Petitioners argue that any underpayment set forth on the 2011 or 2012 tax return cannot be attributed to inaccuracies in QuickBooks records because using the QuickBooks records for those years would have resulted in an overstatement of income tax for each of those years. Petitioners also argue that any underpayments for the 2012 through 2014 tax years are attributable to Accounting Firm's use of Forms 1099 to prepare the tax returns and not to inaccuracies in the QuickBooks records. Accordingly, petitioners argue, the underpayments for the years at issue are not due to fraud.

However, as reflected in the comparison of various gross receipts computations *supra* Findings of Fact Part VI, and for the reasons discussed *supra* Findings of Fact Parts IV.B through E, Accounting Firm did not simply use Forms 1099 to prepare the MedExpress tax returns. It is true—understandably, given the issues with the MedExpress QuickBooks records highlighted in connection with the 2011 amended tax return—that Accounting Firm did not simply use QuickBooks records. However, Accounting Firm used a variety of information provided by Dr. Fawad about MedExpress income to prepare the returns for the years at issue. For the 2011 amended tax return, that included information about nontaxable deposits into the MedExpress business

**[\*26]** bank account. For 2012, it included a bare assertion by Dr. Fawad as to what the MedExpress gross receipts were. For the 2013 and 2014 tax years, it included information about Forms 1099—which Ms. Allen was able to and did check against the forms themselves—but also Dr. Fawad's claims about cash payments. And for all of the years at issue, the information provided by Dr. Fawad was wrong.

In a similar context, the Court rejected a taxpayer's argument that the fraud penalty should not apply because "a thorough professional job of accounting would have uncovered the inaccuracies" in the taxpayer's books and records. *See Estate of Temple*, 67 T.C. at 162–63. And the Court has rebuffed efforts by a medical professional to avoid the penalty in reliance on a return preparer who admittedly did more than Accounting Firm apparently did to question the taxpayer's assertions of income, *see Kohan*, T.C. Memo. 2019-85, at \*24, \*28, although Dr. Fawad may have been more effective in pulling the wool over Accounting Firm's eyes by volunteering the existence of some cash payments without prompting. In that case, the Court explained:

> [The preparer] might have been more aggressive in questioning [the medical professional] about other payments his patients might have made by cash, check, or credit card. But even if she were thought to have turned a blind eye to the possible existence of additional income, that would not immunize [the medical professional] from his deliberate and intentional failure to report that income to her.

*Id.* at \*28. In this case, as in those, the underpayments are attributable to the various actions undertaken by petitioners that led Accounting Firm to incorrectly rely on the false information they provided. Therefore, at least a portion of the underpayment of tax required to be shown on the return for each year at issue is due to fraud, and petitioners have not established a portion that is not attributable to fraud. *See* § 6663(b).

E.    *Reasonable Cause*

Section 6664(c)(1) provides that no penalty will be imposed under section 6663 with respect to a portion of an underpayment for which it is shown that there was a reasonable cause and that the taxpayer acted in good faith with respect to such portion. Reasonable cause may exist if a taxpayer relies on professional advice if the taxpayer proves by a

**[\*27]** preponderance of the evidence that (1) the adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him or her, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

Dr. Fawad contends that his retaining and relying on the advice and actions of Accounting Firm qualifies him for the reasonable cause defense. Specifically, he argues that the underreporting of income during the years at issue is due to Accounting Firm's inappropriate use of Forms 1099 to prepare tax returns rather than its reliance on the books and records of MedExpress. He highlights Mr. Alexander's critiques of Accounting Firm. However, his contentions lack merit.

As a preliminary matter, it is not even clear that Accounting Firm provided advice, given that "advice" requires a communication that reflects the adviser's "analysis or conclusion." *Woodsum v. Commissioner*, 136 T.C. 585, 593 (2011). Furthermore, reliance on a bookkeeper or accountant is no defense to fraud if the taxpayer failed to provide the accountant "with all of the data necessary for maintaining complete and accurate records." *Korecky v. Commissioner*, 781 F.2d at 1569 (quoting *Merritt v. Commissioner*, 301 F.2d 484, 487 (5th Cir. 1962), *aff'g* T.C. Memo. 1959-172); *see also Midwest Med. Aesthetics Ctr. v. Commissioner*, T.C. Memo. 2024-32, at \*47; *Le*, T.C. Memo. 2020-27, at \*34; *Kohan*, T.C. Memo. 2019-85, at \*24. Dr. Fawad was expressly notified in engagement letters between MedExpress and Accounting Firm that return preparation was completed using information furnished by MedExpress and that Accounting Firm would not audit or otherwise undertake actions "designed to discover defalcations and/or other irregularities, should any exist." Rather, it was the company's responsibility to provide all the information required for the preparation of complete and accurate tax returns. Accounting Firm did not regularly request and receive petitioners' personal bank account statements or information from Greenway when preparing the MedExpress income tax returns. Accounting Firm used all information provided by Dr. Fawad during return preparation and took it at face value. Dr. Fawad was aware of that and nevertheless provided limited and incorrect information to Accounting Firm. *See supra* Opinion Part II.C.5.

The Court has concluded in an analogous case that "[e]ven if we were inclined to accept [the] argument that [the taxpayer] was only

[*28] grossly negligent in the maintenance of his books and records, we are satisfied that he was no mere innocent beneficiary of the fraudulent returns prepared by [his tax return preparer]." *Estate of Temple*, 67 T.C. at 163. Here, Dr. Fawad provided the information reported as gross receipts on the MedExpress Forms 1120S. Accordingly, this Court finds that Dr. Fawad did not provide Accounting Firm with necessary and accurate information and did not rely on Accounting Firm's judgment. He has failed to prove that he had reasonable cause and acted in good faith for purposes of availing himself of the relief provided by section 6664(c)(1).

III.   *Statute of Limitations*

Tax must generally be assessed within three years from the date on which the return was filed. § 6501(a). However, if a taxpayer files a false or fraudulent return with the intent to evade tax, the tax may be assessed at any time. § 6501(c)(1). The Court has previously held that in the case of a joint return, a finding of fraudulent intent on the part of one taxpayer permits section 6501(c)(1) to apply with respect to the return for purposes of assessing tax against the other taxpayer. *See, e.g.*, *Kwong v. Commissioner*, 65 T.C. 959, 967 (1976); *Vannaman v. Commissioner*, 54 T.C. 1011, 1018 (1970).

The Commissioner bears the burden of proving an exception to the general limitations period. *See Gould v. Commissioner*, 139 T.C. at 431. The Commissioner's burden of proof under section 6501(c)(1) is the same as the burden to prove applicability of the section 6663 civil fraud penalty. *Gould*, 139 T.C. at 431. Thus, because this Court concludes that Dr. Fawad had the requisite fraudulent intent for purposes of the section 6663 fraud penalties, this Court concludes that Dr. Fawad had the requisite fraudulent intent for purposes of section 6501(c). It is immaterial that Dr. Malika did not have fraudulent intent given that the return was a fraudulent return with the intent to evade tax. Accordingly, the tax for each of the years at issue may be assessed against both petitioners.

IV.   *Conclusion*

Numerous badges of fraud are present in this case. Respondent has proven by clear and convincing evidence that there was an underpayment of tax required to be shown on the return for each of the years at issue and that each underpayment was due to fraud by Dr. Fawad. The fraud penalty applies to the entire underpayment for

**[\*29]** each year at issue, as Dr. Fawad failed to establish that any portion of any underpayment was not attributable to fraud or that he qualified for the reasonable cause defense.

This Court has considered all of the arguments made by the parties and, to the extent they are not addressed herein, finds them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*